# REPORT OF
## PHASE I
## ENVIRONMENTAL SITE ASSESSMENT
## OF TWO TRACTS:
## A 14.64 ACRE MOBILE HOME PARK AND
## AN UNDEVELOPED 13.37 ACRE TRACT
### P99-246

## PREPARED FOR
## SCOTT HUTCHISON
## SCOTT HUTCHISON ENTERPRISES, INC.
## 302 12TH AVENUE
## HUNTINGTON, WEST VIRGINIA 25701

## NOVEMBER 8, 1999

Copyright © 1999 RHODES INCORPORATED
All rights reserved,
including the right to reproduce this report
or portions thereof in any form.

EXHIBIT

1



**RHODES**
**INCORPORATED**
*Engineers • Geologists • Drilling*

November 8, 1999

Mr. Scott Hutchison
Scott Hutchison Enterprises, Inc.
302 12th Avenue
Huntington, West Virginia 25701

Re:    Phase I Environmental Site Assessment of Two Tracts:
        A 14.64 Acre Mobile Home Park and
        An Undeveloped 13.37 Acre Tract

Dear Mr. Hutchison:

RHODES INCORPORATED has completed the authorized Phase I Environmental Site Assessment of the combined 28.11 acre mobile home park and the undeveloped tract located in the community of Burlington, Ohio southeast of South Point, Ohio lying adjacent to the Ohio River.

The following is our report of this investigation which included:

- A walkover survey of the entire site to identify any environmental concerns that may be present. The reconnaissance included observations of soil and grass for evidence of spills such as stained areas, noxious odors, stressed vegetation, and discolored or cloudy water. Also, any indications of past or present storage use or disposal of hazardous substances or petroleum products occurring at this site.

- Review of deed records at the Lawrence County, Ohio Clerk's Office to establish a chain-of-title for the property.

- Review of Federal and State Government records to identify facilities listed in U.S. Environmental Protection Agency and Commonwealth of Kentucky environmental databases.

- Review of published historical, geological, topographic, and soil maps to identify any pipelines, high tension lines, streams, springs, surface water bodies, flood plains, sinkholes, faults, wetlands, or other environmentally sensitive features.

- Survey of surrounding properties to identify current facilities with the potential to produce a negative environmental impact on the site.

R00020

Phase I Environmental Site Assessment of Two Tracts:
A 14.64 Acre Mobile Home Park and
An Undeveloped 13.37 Acre Tract
November 8, 1999

This report includes sections on:

- Site Geology
- Site Soils Description
- Site Description
- Site Reconnaissance
- Surrounding Properties
- Site History
  Historical Maps/Aerial Photos
  Title History
- Environmental Records Review
- Conclusions & Recommendations
- Limitations
- Appendix
  Site Vicinity Map
  Geologic Map
  Topographic Map
  Site Photo Essay
  Eco Search Environmental Site Assessment

## SITE GEOLOGY

Geologic information was referenced from the 1981 Geologic Map of Ohio for both tracts. Material underlying the sites are classified as Pc (Conemaugh) which is a combination of shales, sandstones, coal and limestone. Conemaugh is a member of the Upper Pennsylvania Geologic Age.

No mapped faults are located within a one mile radius of the project site. Active faults do not reach the surface in Ohio and cannot be mapped without the aid of subsurface techniques.

The generalized direction of groundwater flow within the area is expected to be to the south towards the Ohio River.

## SITE SOILS DESCRIPTION

Site inspection confirmed that the soils are alluvial deposits (up to 60 ft. deep) of clay, silt, sand, and gravel. No evidence of fill soils was encountered at the mobile home park. The undeveloped tract appears to have some fill on the southern ½ of the lot. Also, a mound of fill is located on the southeastern side (Photo No. 1). The source and nature of these fill soils is unknown.

R00021

Phase I Environmental Site Assessment of Two Tracts:
A 14.64 Acre Mobile Home Park and
An Undeveloped 13.37 Acre Tract
November 8, 1999

The groundwater source for this area is a relatively thick permeable layer of sand and gravel deposited beneath the layer of alluvium soils, which produces enough water to supply the local water district.

## SITE DESCRIPTION

The assessed area consists of two sites which will be discussed individually in this section.

### Mobile Home Park

The mobile home park lies on the south side of County Road 1. The location of this site is shown on the site vicinity map in the Appendix of this report. Total acreage for this site is 14.64 acres of land. Associated mobile homes and storage buildings to this site are not conveyed with the land and are owned by the occupants who rent spaces for parking. Site access is obtained via an asphalt drive with parking areas for the individual mobile homes (Photo No. 13).

This property is fronted on the north by County Road 1, on the west by residential property, on the south by the Ohio River, and on the east by residential property.

The center running east and west of the park is crowned, sloping to the north and south (Photo Nos. 2 & 3). Surface water drainage thus flows in these directions. Surface water running to the north is carried off site by a drainage ditch that runs along County Road 1. Surface water running to the south flows directly into the Ohio River (Photo No. 4).

### Undeveloped Tract

The undeveloped tract lies to the north of County Road 1 and extends to Hwy 52. The location of this tract is shown on the Site Vicinity Map in the Appendix.

The site consists of 13.37 acres of scrub land with no associated buildings or any areas of pavement within the parcel boundaries (Photo Nos. 5-7).

The property is fronted on the north by Hwy 52, the northwest by an open field, the southwest by L. J. Navy Trucking Company, the south by County Road 1, and the east by residential property.

R00022

Phase I Environmental Site Assessment of Two Tracts:
A 14.64 Acre Mobile Home Park and
An Undeveloped 13.37 Acre Tract
November 8, 1999

Surface drainage on the north ½ of the tract is carried off-site by a drainage ditch which flows to an unnamed creek, a tributary of the Ohio River (Photo Nos. 8-10).  The south ½ of the surface flow is to the west where it is intercepted by a drainage ditch which lies in front of L. J. Navy Trucking Company (Photo No. 11).  Minor pooling of water was observed near the southwest edge of the tract.

## SITE RECONNAISSANCE

The site reconnaissance for the subject property was conducted by qualified personnel from Rhodes Incorporated on October 26, 1999.  The reconnaissance included an inspection of the entire properties and adjacent properties for any visible evidence of past or present environmental hazards that may impact the subject property. All photographs taken during the site reconnaissance are presented in the Photo Essay section in the Appendix.

Access to the mobile home site is readily obtained from an asphalt drive that runs to all mobile home locations (Photo Nos. 12 & 13).  Access to the undeveloped site is obtained only by foot.  This tract has secondary tree and bramble growth over the entire site (Photo Nos. 1, 5-7).

Physical evidence was seen of electric and telephone services being available to the sites.  Pole-mounted transformers located on the mobile home tract are new and, as such, should house non-PCB containing fluids (Photo Nos. 16 & 17).  There are no pole-mounted transformers located on the undeveloped tract.

An old rusted oil fuel tank was located behind Trailer 51 showing no evidence of physically ever having been used at this site.  All trailers are electric (Photo No. 15).

The mobile home park was observed to have household debris on the lower terrace facing the river.  This debris is deposited by the river when it reaches higher levels and has no environmental impact on the site (Photo No. 18).

The undeveloped tract was observed to have small areas of illegal dumping of building materials throughout the site (Photo Nos. 21-25).  In some of these piles, shingles and other questionable materials were observed.  Removal of the debris from this site does present an environmental concern and thus should be tested for asbestos.

Phase I Environmental Site Assessment of Two Tracts:
A 14.64 Acre Mobile Home Park and
An Undeveloped 13.37 Acre Tract
November 8, 1999

There were no noxious odors or discolored water present in the exposed subgrade soils during both site inspections. There was also no evidence of environmentally hazardous materials being stored on the mobile home property.

## SURROUNDING PROPERTIES OF THE MOBILE HOME PARK

Surrounding properties of the subject site were examined on October 26, 1999, to identify and evaluate any potential source of contamination that may produce recognized environmental conditions in respect to the site.

The north side of this parcel fronts County Road 1 which is down-gradient from the site. Across County Road 1 is the undeveloped tract discussed in this report (Photo No. 5).

To the south lies the Ohio River which is also down-gradient and, at the time of inspection, was close to 25 feet below the mobile home park (Photo No. 4).

East and west equi-gradient to the park are residential properties and storm water run-off from these sites are carried to the north (drainage ditch) and south (Ohio River) by natural contouring, thus having no impact to the mobile home park (Photo Nos. 19 & 20).

## SURROUNDING PROPERTIES OF THE 13.37 ACRE UNDEVELOPED TRACT

Surrounding properties of the subject site were examined on October 26, 1999, to identify and evaluate any potential source of contamination that may produce recognized environmental conditions in respect to the site.

To the north of this site is Hwy 52 which is up-gradient. Any sheeting of water from the highway is intercepted by a drainage ditch (Photo Nos. 8 & 9). Site observation suggests that flooding potential is slight to moderate from the storm water runoff of Hwy 52.

To the south, up-gradient across County Road 1, lies the mobile home park discussed in this report. Any storm water run-off would sheet to the drainage ditch which lies along the edge of the road. This drainage ditch was observed not to be deep enough to keep water from pooling at the southwest corner of the subject property.

R00024

Phase I Environmental Site Assessment of Two Tracts:
A 14.64 Acre Mobile Home Park and
An Undeveloped 13.37 Acre Tract
November 8, 1999

East and equi-gradient to the undeveloped tract is residential property (Photo No. 26).

West and equi-gradient is the L. J. Navy Trucking Company containing a diesel UST which presents a potential to impact the subject property (Photo No. 11). No physical or documented evidence of a product release was found.

## SITE HISTORY

As part of the environmental site assessment, an investigation of historical records concerning the site was conducted by RHODES INCORPORATED to develop a brief history of previous occupancies and users connected with the property. This was done in an effort to identify any past uses which may have resulted in a negative environmental impact on the site soils or groundwater. Photocopies of the maps are located in the Appendix.

Information sources consulted during this phase of the investigation included the following:

- USGS 7.5 minute Geological Maps of the State of Ohio, 1981.

- USGS 7.5 minute Topographic Map of the Catlettsburg, Kentucky-Ohio-West Virginia Quadrangle, 1968, Revised 1985.

- On-line: Ohio Transportation Cabinet for highway maps and the County Tiger/Line Census files, 1992.

- On-line: Water Resources of Lawrence County, Ohio.

- On-line: Landslides in Ohio, Ohio Department of Natural Resources.

- On-line: National Earthquake Information Center. Subject Faults East of the Rocky Mountains.
- On-line: USDA Soil Conservation Service.

- Recorded land title records at the Lawrence County, Ohio Clerk's Office.

R00025

Phase I Environmental Site Assessment of Two Tracts:
A 14.64 Acre Mobile Home Park and
An Undeveloped 13.37 Acre Tract
November 8, 1999

## HISTORICAL MAPS/AERIAL PHOTOS

A geologic map showing the area of the site published by the U.S. Geological Survey in 1981 shows no structures due to the scale of 1:1600 ft.

Topographic maps showing the area of the site published by the USGS in 1968 show the subject property and its vicinity and also shows no structures on both subject sites with adjacent dwellings to the east and west.

Structures are indistinct on the Boyd and Greenup Counties, Kentucky, 1975, USDA Aerial Map due to the scale of the photo (1:253.440), thus, no copies were made.

The Lawrence County, Ohio Tiger/Line Census files were viewed on-line, and no copy was made.

## TITLE HISTORY

Recorded land title records were reviewed at the Lawrence County Clerk's office in Ironton, Ohio.

443:479, 438:602, 438:596, 438:604   April 22, 1977
Numerous quit claim deeds from Jeanne D. Boggs to husband Henry T. Boggs.

231:464   March 26, 1956
Anna A. Cassatt single $1.00 paid token to H. T. Boggs.  Fractioned Sec. 2 Township 1 Range 17.  Fayette Township, Lawrence Co. State of Ohio.  Lots 8 and 9 of Fry's land.

192:192 Lot 8 & 9   December 2, 1948
Grace D. Cassatt of Raleigh, North Carolina died testate September 21, 1948.  Lot #8 of Fry land,  Lot #9 of Fry land being owned jointly with Anna A. Cassatt being same property conveyed to Edward Cassatt by Jane Jackson et al. November 14, 1893 56:550.

156:438   August 10, 1934
Edward and U. R. Cassatt his (wf) to Grace P. Cassatt and Anna A. Cassatt.

R00026

Phase I Environmental Site Assessment of Two Tracts:
A 14.64 Acre Mobile Home Park and
An Undeveloped 13.37 Acre Tract
November 8, 1999


## ENVIRONMENTAL RECORDS REVIEW

A review of all available Federal Government, Kentucky State Government environmental records, and other supplemental records was conducted by Eco Search Environmental Resources, Inc. The review included a detailed search of twenty-three (23) United States Environmental Protection Agency (EPA) environmental databases on the subject properties. The data base searches were conducted in accordance with recommended search radii guidelines contained in the ASTM publication E 1527, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process. The following Federal and State environmental databases were examined:

- **National Priorities List**
  US Environmental Protection Agency, Office of Solid Waste and Emergency Response. 703/603-8881. The NPL Report, also known as the Superfund list, is an EPA listing of uncontrolled or abandoned hazardous waste sites. The list is primarily based upon a score which the site receives from the EPA's hazardous ranking system. These sites are targeted for possible long-term remedial action under the Superfund Act. Date of Data: 1/11/99, Release Date: 1/11/99.

- **No Further Remedial Action Planned Sites**
  US Environmental Protection Agency, Office of Solid Waste and Emergency Response. 703/603-8881. The No Further Remedial Action Planned Report (NFRAP) contains information pertaining to sites which have been removed from the Federal EPA's CERCLIS Database. NFRAP sites may be sites where, following an initial investigation, no contamination was found, contamination was removed quickly without need for the site to be placed on the NPL, or the contamination was not serious enough to require Federal Superfund Action or NPL consideration. Date of Data: 1/11/99, Release Date: 1/11/99.

- **Emergency Response Notification System - 1995**
  US Environmental Protection Agency, Office of Solid Waste and Emergency Response. 202/260-2342. ERNS is a national computer database system that is used to store information on the sudden and/or accidental release of hazardous substances, including petroleum, into the environment. The ERNS reporting system contains preliminary information on specific releases, including the spill location, the substance released, and the responsible party. Date of Data: 7/1/99, Date of Release: 7/1/99.

- **Comprehensive Environmental Response, Compensation, And Liability Information System (Active)**
  US Environmental Protection Agency, Office of Solid Waste and Emergency Response. 703/603-8730. The CERCLIS list is a compilation of known or suspected uncontrolled or abandoned hazardous waste sites. These sites have either been investigated, or are currently under investigation by the EPA for the release, or threatened release of hazardous substances. Once a site is placed in CERCLIS, it may be subjected to several levels of review and evaluation and ultimately placed on the National Priorities List. Date of Data: 1/11/99, Release Date: 1/11/99.

R00027

Phase I Environmental Site Assessment of Two Tracts:
A 14.64 Acre Mobile Home Park and
An Undeveloped 13.37 Acre Tract
November 8, 1999

- **Ohio Solid Waste Facility Report**
  OH Environmental Protection Agency, Division of Solid and Infectious Waste Management.
  614/728-5354. This state database lists known active and inactive solid waste disposal sites in
  the State of Ohio. For more complete information purposes, identified town gas sites are
  included. Where incomplete address information was given, inactive and town gas sites were
  plotted according to the latitude and longitude provided by the State. The current portion of
  this list is updated ad released annually by the Ohio EPA. Date of Data: 10/15/98, Date of
  Release: 10/15/99, Active Date: 12/18/98.

- **Ohio Leaking Underground Storage Tank (LUST) List**
  OH Division of State Fire Marshal, Bureau of Underground Storage Tank Regulation.
  614/752-7938. The Ohio LUST list provides information on known leaking underground storage
  tanks and tank removal actions in the State of Ohio. Date of Data: 09/01/99, Date of Release:
  09/01/99, Active Date: 10/06/99.

- **Ohio Underground Storage Tank (UST) List**
  OH Division of State Fire Marshal, Bureau of Underground Storage Tank Regulation.
  614/644-9425. The Ohio UST list provides the location of registered underground storage tanks.
  Recently, the Bureau of Underground Storage Tank Regulation removed from the publicly
  available list of underground storage tanks all tanks with a "removed" status, citing the
  availability of all sites with tank removals on the LUST list.. Date of Data: 09/01/99, Date of
  Release: 09/01/99, Active Date: 10/06/99.

- **Ohio Master Sites List**
  OH Environmental Protection Agency, Division of Emergency and Remedial Response. 614/644-
  2924. This database identifies sites deemed by the State of Ohio for remediation. It is released
  on an annual basis by the Ohio EPA. Date of Data: 03/29/99, Release Date: 06/20/99. Active
  Date: 09/14/99.

- **Resource Conservation and Recovery Information System**
  Includes selective information on sites which generate, transport, store, treat, and/or dispose of
  hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA). Date of
  Data: 01/01/99, Release Date: 02/02/99.

- **Corrective Action Report**
  Identifies hazardous waste handlers with RCRA corrective action activity. Date of Data:
  01/01/99, Release Date: 02/02/99.

- **PCB Activity Database System**
  PADS identifies generators, transporters, commercial stores and/or brokers and disposers of
  PCB's who are required to notify the EPA of such activities. Date of Data: 3/26/96, Active Date:
  07/14/98.

- **Toxic Chemical Release Inventory System**
  TRIS identifies facilities which release toxic chemicals to the air, water, and land in reportable
  quantities under SARA Title III Section 313. Date of Data: 10/95, Active Date: 08/10/98.

R00028

Phase I Environmental Site Assessment of Two Tracts:
A 14.64 Acre Mobile Home Park and
An Undeveloped 13.37 Acre Tract
November 8, 1999

- **Toxic Substances Control Act**
  TSCA identifies manufacturers and importers of chemical substances included on the TSCA chemical substance inventory list. It includes data on the production volume of these substances by plant site. Date of Data: 5/14/86.

- **Leaking Underground Storage Tank Incident Reports**
  LUST records contain an inventory of reported leaking underground storage tank incidents. Not all states maintain these records; the information stored varies by state. No Dates Listed.

- **Section Seven Tracking System**
  This system tracks the registration of pesticide-producing establishments and tracks the types and amounts of pesticides, active ingredients, and devices which are sold, produced, or distributed annually. Date of Data: 07/31/98, Active Date: 08/27/98.

- **Civil Enforcement Docket**
  Contains information on civil and administrative actions filed by the Department of Justice for the US Environmental Protection Agency. Date of Data: 09/03/98, active Date: 02/03/99.

## CONCLUSIONS & RECOMMENDATIONS

Rhodes Incorporated has performed the Phase I Environmental Site Assessment in the scope and limitations of ASTM Practice E-1527 and E-1528 and Standard Industry Practice for the 14.64 acre mobile home park and 13.37 acre undeveloped tract across County Highway 1 from the mobile home park. A review of available Federal Government, Ohio State Government environmental records and other supplement records was conducted by Eco Search Environmental Resources.

Site reconnaissance for the proposed acquisition properties was conducted by qualified personnel from Rhodes Incorporated on October 26, 1999. The reconnaissance included an inspection of the entire tracts and adjacent property for any visible evidence of past or present environmental hazards that may impact the subject property.

Site reconnaissance and records research of the 14.46 acre mobile home park revealed no physical evidence of environmental conditions in respect to the site. Located on the 13.37 undeveloped tract were areas of unlawful dumping of building debris. Rhodes Incorporated recommends that asbestos testing of the debris areas be conducted to determine the correct means of disposal for the debris. Equigradient and adjacent UST containing diesel fuel presents a potential to impact the subject property but no physical or documented evidence of a release was found. No other recognized environmental conditions were revealed in respect to the undeveloped tract during the site reconnaissance and records search.

R00029

Phase I Environmental Site Assessment of Two Tracts:
A 14.64 Acre Mobile Home Park and
An Undeveloped 13.37 Acre Tract
November 8, 1999

## LIMITATIONS

**Variations** - Since any Environmental Assessment can examine and report only that information which was obtained from available records and site examination, we offer this further recommendation. If any conditions or materials are encountered that were not observed during the site inspection, contact us in order that we may inspect the site and make any modifications in the assessment that may be necessary.

**Other interpretations** - The conclusions and recommendations submitted in this report apply to this site only. They are not applicable to subsequent construction on this site, or to adjacent or nearby projects, sites or buildings. In the event that conclusions or recommendations based on this report and relating to any other projects made by others, such conclusions and recommendations are not the responsibility of Rhodes Incorporated.

**Warranty** - In performing our professional services, we have used that degree of care and skill ordinarily exercised under similar circumstances by members of the profession. This warranty is in lieu of all other warranties, expressed or implied.

Please contact our office if you have any questions regarding this report.

Sincerely,
**RHODES INCORPORATED**

Adonis F. Spivey
Environmental Consultant

James M. Zimmer, P.G.
Project Geologist
Environmental Services

H. Jack Geisler, P.E.
Vice President, Engineering Services

AFS JMZ HJG/sem
99-246

Attachments

R00030

LEXSEE 2002 OHIO APP. LEXIS 2724

**FRED JAMES, et al., Plaintiffs-Appellants,- vs - ROY PARTIN, et al., Defendants-Appellees.**

**CASE NO. CA2001-11-086**

**COURT OF APPEALS OF OHIO, TWELFTH APPELLATE DISTRICT, CLERMONT COUNTY**

*2002 Ohio 2602; 2002 Ohio App. LEXIS 2724*

**May 28, 2002, Decided**

**PRIOR HISTORY:** [**1] CIVIL APPEAL FROM COMMON PLEAS COURT.

**DISPOSITION:** Trial court's judgment was affirmed.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** Nippert & Nippert, Jeffrey K. Lurie, Cincinnati, OH, for plaintiffs-appellants, Fred James and Renee James.

Statman, Harris, Siegel & Eyrich, Paul D. Rattermann, Cincinnati, OH, for defendants-appellees, Tri-Star Title Agency, Inc. and Union Savings Bank.

Rendigs, Fry, Kiely & Dennis, LLP, Christopher R. Carville, Cincinnati, OH, for defendant-appellee, Paul A. Byrnside dba Byrnside Surveying, Inc.

Thompson Hine LLP, Gerald W. Simmons, William L. Martin, Jr., Cincinnati, OH, for defendant-appellee, Zicka Homes, Inc.

Eugene M. Gelfand, Cincinnati, OH, for defendants-appellees, Re-Max Unlimited and Larry Hawk.

Eric J. Fernandez, Hamilton, OH, for defendant-appellee, Amos Greene.

**JUDGES:** YOUNG, J. POWELL, P.J., and VALEN, J., concur.

**OPINIONBY:** YOUNG

**OPINION: YOUNG, J.**

[*P1] Plaintiffs-appellants, Fred and Renee James, appeal the decision of the Clermont County Court of Common Pleas granting one summary judgment in favor of defendants-appellees, Amos Greene, Paul A. Byrnside and Koopman-Sheckles & Assoc. ("Koopman"), and a second summary judgment in favor of defendants-appellees, Re-Max Unlimited [**2] ("Re-Max"), Larry Hawk, Tri-Star Title Agency, Inc. ("Tri-Star"), Union Savings Bank ("Union"), and Zicka Homes, Inc. ("Zicka"). The trial court's decision is affirmed.

[*P2] On October 27, 1992, appellants purchased a tract of land from Iva and Roy Partin. Iva and Roy Partin are now presumed deceased. The property was advertised as ten acres, and appellants believed it contained ten acres based upon the title search. The deed recorded by appellants describes the property as 10.087 acres. On December 7, 1997, appellants were informed that one acre of their property was actually owned by Zicka. On December 21, 1998, appellants quitclaimed the disputed acre to Zicka.

[*P3] Appellants filed a complaint on October 7, 1999. Appellants claim they suffered damages as a result of the professional negligence of the surveyor-appellees, Greene, Byrnside and Koopman. Greene, Byrnside and Koopman moved for summary judgment asserting appellants' claims were barred by the statute of limitations. All remaining parties also filed motions for summary judgment.

[*P4] On April 19, 2001, the trial court granted summary judgment in favor of Greene, Byrnside and Koopman, finding that appellants' [**3] claims were barred by the statute of limitations applicable to claims

2002 Ohio 2602, *; 2002 Ohio App. LEXIS 2724, **

of professional negligence under *R.C. 2305.09*. On July 26, 2001, the trial court granted the motions of appellees Re-Max, Hawk, Tri-Star, Union, and Zicka for summary judgment. Appellants appeal the decisions raising two assignments of error:

Assignment of Error No. 1:

[*P5] THE TRIAL COURT ERRED AS A MATTER OF LAW IN GRANTING THE FIRST SUMMARY JUDGMENT ON THE GROUND THAT APPELLANT'S [SIC] SUIT WAS TIME BARRED BY THE FOUR YEAR STATUTE OF LIMITATIONS IN *R.C. 2305.09(D)*.

[*P6] An appellate court reviews a summary judgment on a de novo basis. See *Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105, 1996 Ohio 336, 671 N.E.2d 241*. Pursuant to Civ.R. 56(A) and (B), either party to a lawsuit can make a motion for summary judgment. A summary judgment is properly granted when: 1) there is no genuine issue as to any material fact, 2) the moving party is entitled to judgment as a matter of law, and 3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment [**4] is made. *Harless v. Willis Day Warehousing Co. (1976), 54 Ohio St.2d 64, 66, 8 Ohio Op. 3d 73, 375 N.E.2d 46*.

[*P7] Appellants argue that until there is an injury to a legally protected interest, no cause for negligence accrues. Appellants argue they had no reason to commence litigation until they knew the survey was conducted in a negligent manner. Therefore, appellants contend the trial court should have "considered when the cause of action accrued, not when appellants discovered the injury" and applied a "delayed damages" theory to this case in order to extend the limitation period.

[*P8] *R.C. 2305.09* provides a general limitation period for tort actions not specifically covered by other sections of the Ohio Revised Code. General claims of professional negligence which are outside the ambit of *R.C. 2305.10* and *R.C. 2305.11* are governed by the four-year limitations period in *R.C. 2305.09(D)*. *Investors REIT One v. Jacobs (1989), 46 Ohio St.3d 176, 179, 546 N.E.2d 206*. The Supreme Court of Ohio has held that the discovery rule is inapplicable to a claim [**5] in professional negligence arising under *R.C. 2305.09*. *Id. at 212*. The delayed damages theory advanced by appellants has been rejected on the basis that it is "a distinction without a difference" of the discovery rule. *Riedel v. Houser (1992), 79 Ohio App.3d 546, 549, 607 N.E.2d 894*. See, also, *Jim Brown Chevrolet, Inc. v. S.R. Snodgrass, A.C. (2001), 141 Ohio App.3d 583, 587-88, 752 N.E.2d 335*; *Hater v. Gradison Div. Of McDonald &*

*Co. (1995), 101 Ohio App.3d 99, 110-11, 655 N.E.2d 189*.

[*P9] Despite the case law supporting the decision in Investors REIT One against applying a delayed damages theory to professional negligence cases, appellants argue *Fritz v. Bruner Cox, L.L.P. (2001), 142 Ohio App.3d 664, 756 N.E.2d 740*, "confirms the impression that courts of this state continue to flee from the rule set forth in Investors REIT One." The court in Fritz determined a delayed damages theory was applicable to a *R.C. 2305.09(D)* professional negligence action for a negligently prepared tax return because there is no injury until the I.R.S. [**6] determines to levy a penalty assessment. *Id. at 668*. However, in this case, the injury occurred when the allegedly negligent surveys were completed. Therefore, the Fritz decision is not applicable to this case.

[*P10] Appellants also maintain the decisions in *NCR Corporation v. United States Mineral Products Company, 72 Ohio St.3d 269, 1995 Ohio 191, 649 N.E.2d 175*, and *Harris v. Liston, 86 Ohio St.3d 203, 1999 Ohio 159, 714 N.E.2d 377*, demonstrate "that the Supreme Court of Ohio has backed away from the rationale expressed in Investors REIT One." However, this assertion is misplaced when discussing professional negligence cases.

[*P11] NCR and Harris deal with physical damage to real property, not professional negligence. The issue presented in NCR was when a cause of action accrues for asbestos-removal litigation, and the issue presented in Harris was when a cause of action accrues for damage to property caused by standing water. The court in NCR allowed the use of the discovery rule because when the negligent act is committed in a property damage case, a plaintiff may only have sustained a potential [**7] or contingent injury, and such a potential cause of action may not survive a motion to dismiss. NCR at 271. The decision in Harris relied upon the decision of NCR. Harris at 207. In this case there was no potential or contingent injury because any alleged injury occurred and was complete when the survey was finished. Furthermore, appellants could have discovered the injury any time after the survey was complete with a new survey. Therefore, NCR and Harris are not applicable to this professional negligence case.

[*P12] Based on the case law, the use of the discovery rule or a "delayed damages" theory is not applicable to claims of professional negligence in a property damage case. Since the discovery rule or a "delayed damages" theory is not applicable to this case, appellants' claims of professional negligence commenced to run when the allegedly negligent surveys were completed, and not at the time appellants discovered the

injury. Therefore, there are no genuine issues as to any material facts.

[*P13] Greene, Byrnside and Koopman admit to surveying the property. Appellants accept the assertion that Greene surveyed the property in 1979, Byrnside [**8] in 1982, and Koopman in 1992. Since any alleged injury occurred when the surveys were concluded, reasonable minds can come to but one conclusion. That conclusion is that appellants' claims of professional negligence against Greene, Byrnside and Koopman are barred by the four-year statute of limitations under *R.C. 2305.09(D)*. Greene, Byrnside and Koopman are entitled to judgment as a matter of law, therefore, the trial court did not err in granting the first summary judgment. Consequently, the first assignment of error is overruled.

Assignment of Error No. 2:
[*P14]  THE  TRIAL  COURT  ERRED AS  A  MATTER  OF  LAW  IN GRANTING  THE  SECOND SUMMARY JUDGMENT.

[*P15] Appellants argue the trial court should have considered the second summary judgment as a present title action rather than a quiet title action. However, appellants held a deed to ten acres of property, and Zicka claimed ownership to one acre of the ten. Where there are mutual adverse claims to title, a quiet title action is proper. *Sellman v. Schaaf (1971), 26 Ohio App.2d 35, 39, 55 Ohio Op. 2d 69, 269 N.E.2d 60*. Appellants, nevertheless, did not seek to quiet title, but instead chose to voluntarily [**9]  convey the acre to Zicka by quitclaim deed on December 21, 1998.

[*P16] A quitclaim deed, if otherwise valid, is a recognized, effective and valid instrument of conveyance. *Alston v. Alston (1964), 4 Ohio App.2d 270, 276, 33 Ohio Op. 2d 311, 212 N.E.2d 65*. The validity of the quitclaim deed in this case was never questioned. Therefore, reasonable minds can come to but one conclusion, and that conclusion is that Zicka now owns the once disputed acre and has present title and the right of possession. Therefore considering the second summary judgment as a present title action is unwarranted.

[*P17] Appellants also argue no issue of adverse possession arose in this case because appellants never adversely possessed the property. However, any rights appellants had under an adverse possession theory, whatever those rights may have been, were relinquished when they quitclaimed the property to Zicka. Therefore, a discussion of whether appellants adversely possessed the property is likewise unwarranted.

[*P18] Appellants argue nothing in *Sellman* requires them to file a quiet title action as a predicate to

being able to sue Tri-Star, Union, Re-Max, or Hawk. Appellants assert [**10]  Tri-Star, Union, Re-Max, and Hawk never made any claim of title to the disputed acre, therefore Sellman is not applicable. Appellants maintain *Haas v. Gerski (1963), 175 Ohio St. 327, 25 Ohio Op. 2d 212, 194 N.E.2d 765*, demonstrates that it is unnecessary to begin a quiet title action when there is no question as to present record title. However, Haas involved the issue of whether a forcible entry and detainer action could be entertained by a municipal court the same time a quiet title action was pending. *Id. at 329*. The Ohio Supreme Court held that an eviction action only dealt with the right to possession and not legal title, therefore the two actions could proceed simultaneously. *Id. at 330*. This case does not involve a pending quiet title action and there is no dispute over legal title or the right to possession since appellants quitclaimed the property to Zicka. Therefore, Hass is not applicable.

[*P19] Notwithstanding the quitclaim deed to Zicka, appellants have no claim for relief against Re-Max, Hawk, Union and Tri-Star. Appellants have no claim against Tri-Star since a purchaser of land possesses no claim for relief against a title [**11]  examiner who makes a mistake in conducting a title exam without privity of contract because the action does not sound in tort, but must be founded on contract. See *Thomas v. Guarantee Title & Trust (1910), 81 Ohio St. 432, 91 N.E. 183, 7 Ohio L. Rep. 615*, paragraph one of the syllabus. The title examination by Tri-Star was done at the request of Union. Even if it was foreseeable that appellants would rely upon the title examination, in the absence of privity of contract, appellants have failed to state a cause on which relief can be granted. *Kenney v. Henry Fischer Builder Inc. (1998), 129 Ohio App.3d 27, 32, 716 N.E.2d 1189*. Reasonable minds can come to but one conclusion, and that conclusion is that appellants lack privity of contract and have no claim for relief against Tri-Star. Consequently, Tri-Star is entitled to judgment as a matter of law.

[*P20] Likewise, appellants have no claim against Re-Max and Hawk. On June 20, 1992, appellants were given an agency disclosure statement indicating Re-Max and Hawk represented the seller. Appellants both signed the disclosure statement indicating that they had read and understood it before signing the contract [**12]  to purchase the Partins' property. Although real estate agents owe certain duties to the principals who hire them, no such duties exist between agents of the seller and potential or actual purchasers. See *Miles v. Realty One, Inc. (May 9, 1996), 1996 Ohio App. LEXIS 1889*, Cuyahoga App. No. 69506; *Hull v. Arrow Material Prods., Inc. (Sept. 1, 1995), 1995 Ohio App. LEXIS 3945*, Gallia App. 94CA25. Additionally, the contract to purchase the Partins' property, which was signed by both

2002 Ohio 2602, *; 2002 Ohio App. LEXIS 2724, **

appellants, defines what is included in the sale. The contract states, "Real Estate shall include the land." The owner's certification in the contract states, the

[*P23] purchaser is relying solely upon his examination of the real estate, the owner's certification herein, and inspections herein required, if any, for its physical condition and character, and not upon any representation by the real estate agents involved who shall not be responsible for any defects in the real estate.

[*P24] (Emphasis added.) Therefore, appellants have no claim against Re-Max and Hawk sounding in contract for the representation that the parcel contained ten acres.

[*P25] Furthermore, the trial court did not address the statute of limitations in the [**13] second summary judgment and instead chose to render a decision based upon appellants quitclaiming the property to Zicka. However, the quitclaim deed to Zicka does not extinguish all of appellants' claims in this particular case. Appellants' claims against Re-Max and Hawk in tort for negligent misrepresentations may not have been extinguished by quitclaiming the property to Zicka, but the claims are barred by the statute of limitations under *R.C. 2305.09*. See *Chandler v. Schriml (May 25, 2000), 2000 Ohio App. LEXIS 2209,* Franklin App. 99AP-1006. Appellants' economic injury occurred at the time they purchased the property. The fact that appellants did not realize their injury until much later does not change the fact that the financial injury occurred at the closing. *R.C. 2305.09* provides that the statutory period for negligence actions such as a negligent misrepresentation action commences "within four years after the cause thereof accrued."

[*P26] Appellants purchased the property Re-Max and Hawk represented as ten acres on October 27, 1992. Appellants filed a claim on October 7, 1999, nearly seven years after the injury occurred, which is well outside [**14] the statutory four-year period. Therefore, reasonable minds can come to but one conclusion, and that conclusion is that appellants' claim for negligent

misrepresentation against Re-Max and Hawk is barred by *R.C. 2305.09*. Consequently, Re-Max and Hawk are entitled to judgment as a matter of law.

[*P27] Appellants argue in an action for misrepresentation it is "not necessary to allege or prove appellees made representations knowing they were false." It has been held that the intent to deceive may be presumed where a person makes positive statements "as implies the knowledge on his part, when in fact he has no knowledge as to whether his assertion is true or false." *Pumphrey v. Quillen (1956), 165 Ohio St. 343, 347, 59 Ohio Op. 460, 135 N.E.2d 328.*

[*P28] However, the absence of one of the elements of misrepresentation is fatal to the action. *Manning v. Len Immke Buick, Inc. (1971), 28 Ohio App.2d 203, 205, 57 Ohio Op. 2d 308, 276 N.E.2d 253.* The first element is "a representation" that was "falsely made." *Mussivand v. David (1989), 45 Ohio St.3d 314, 322, 544 N.E.2d 265.* Appellants admit that Union never made any misrepresentations [**15] to them, innocent or otherwise. Since Union made no misrepresentation, reasonable minds can come to but one conclusion, and that conclusion is that appellants have no action for misrepresentation against Union. Therefore, Union is entitled to judgment as a matter of law.

[*P29] In sum, Zicka has present title and the right of possession based upon the quitclaim deed, therefore, considering the second summary judgment as a present title action is unwarranted. Union never made any misrepresentations to appellants, therefore appellants have no claim for misrepresentation against Union. Appellants have no claim on which relief can be granted against Tri-Star because appellants lack privity of contract with Tri-Star. Appellants have no claim against Re-Max and Hawk under contract. Furthermore, appellants' claims for negligent misrepresentation against Re-Max and Hawk are barred by *R.C. 2305.09*. Therefore, the trial court made no error in granting the second summary judgment. Consequently, the second assignment of error is overruled.

Judgment affirmed.

POWELL, P.J., and VALEN, J., concur.

LEXSEE 2000 OHIO APP LEXIS 4586

**RODNEY BELL, ET AL., PLAINTIFFS-APPELLANTS, vs. HOLDEN SURVEY, INC., ET AL., DEFENDANTS-APPELLEES.**

**CASE NO. 729**

**COURT OF APPEALS OF OHIO, SEVENTH APPELLATE DISTRICT, CARROLL COUNTY**

*2000 Ohio 2576; 2000 Ohio App. LEXIS 4586*

**September 29, 2000, Decided**

**PRIOR HISTORY:** [*1]

CHARACTER OF PROCEEDING: Civil Appeal from Common Pleas Court. Case No. 21254.

**DISPOSITION:**

Affirmed in part and reversed in part and remanded.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For Plaintiffs-Appellants: Atty. Edward L. Gilbert, Akron, Ohio.

For Defendant-Appellee: Holden Surveying, Inc., Atty. Thomas P. McCue, Louisville, Ohio.

**JUDGES:** Hon. Gene Donofrio, Hon. Edward A. Cox, Hon. Joseph J. Vukovich. Cox, J., concurs, Vukovich, J., concurs.

**OPINIONBY:** Gene Donofrio

**OPINION:** DONOFRIO, J.

Plaintiffs-appellants, Rodney and Deborah Bell, appeal the decision of the Carroll County Court of Common Pleas dismissing their causes of action for fraud, negligence, malpractice, and in declaratory judgment as to the location of certain real property boundary lines.

Defendants-appellees, Leonard and Mildred Jurkiewicz (Jurkiewiczs), owned a large plot of land in Carroll County, Ohio. The land was bordered on the southeast by land owned by Thomas Duffy (Duffy) . In May 1991, the Jurkiewiczs hired Holden Surveying Inc. (Holden) to plat and subdivide the land in order to sell individual lots.

The Jurkiewiczs conveyed by warranty deed one of the parcels which bordered a portion of Duffy's property to defendants-appellees, John and Ruth Royer [*2] (Royers) in May 1991. The Jurkiewiczs also conveyed by warranty deed other parcels which bordered the Royers' parcel to defendants-appellees, Terry and Myrna Lynch (Lynchs) and William and Cynthia Ray (Rays).

The Royers subsequently conveyed their parcel by warranty deed to the Bells in August 1993. In September 1994, Duffy conveyed his land bordering the Bells' property to the south to D. Ladich (Ladich)

In preparation for the transfer of land from Duffy to Ladich, a survey was conducted of the adjoining lands which proved to be inconsistent with the survey performed by Holden. The result was an overlap of the Bell and Ladich parcels.

On July 19, 1995, Ladich filed a complaint (Case No. 20918) naming as party defendants Holden and the Bells. The complaint sought declaratory judgment and an order quieting title of the overlap in favor of Ladich and against the Bells. Ladich also sought an order requiring Holden to replat the adjoining land.

On August 17, 1995, Holden filed a motion seeking dismissal of the Holdens as individual parties. The court held a hearing on the motion on September 28, 1995. The Holdens appeared pro se and the Bells did not appear at all.

2000 Ohio 2576; 2000 Ohio App. LEXIS 4586, *

In a judgment entry [*3] filed on October 6, 1995, the trial court overruled the Holden motion. Also, the court observed that an answer filed by Holden on August 17, 1995, was a joint response by the corporation and the Holdens individually, all under the signature of Virgil L. Holden pro se and as statutory agent. The court noted that the Holdens could defend their personal interests pro se, but that the Holden corporation could only proceed with counsel admitted to the practice of law in this state. Therefore, the court concluded that the Holden corporation was in default and that said default constituted an admission of the truth of the allegations in Ladich's complaint entitling him to the relief he requested.

Upon further review, the court observed that in their respective answers to Ladich's complaint, all of the named parties, including the Bells, admitted the truth of Ladich's complaint, specifically that the prior Holden survey was erroneous and incorrect causing an overlap of the Ladich and Bell tracts and resulting in defective deeds. Most importantly, the court found that all of the parties "concurred" that Ladich was entitled to the relief he requested. Accordingly, the court granted Ladich leave [*4] to file a Civ.R. 12(C) motion judgment on the pleadings.

On October 31, 1995, the trial court issued a judgment on the pleadings quieting title of the overlap in Ladich's favor and ordering a corrective survey of all adjoining lands.

On January 8, 1996, a supplemental judgment entry was filed indicating that an agreement had been reached among the parties whereby Holden would obtain and transfer land from the Bells' property neighbor, Terry and Myrna Lynch (Lynchs), to the Bells in order to restore their parcel to its original size.

When the Lynchs subsequently declined to transfer any of their land, Holden filed a motion for relief from judgment based on impossibility of performance. The Bells, proceeding pro Se, responded in opposition to this motion.

On October 3, 1996, the trial court filed an entry sustaining Holden's motion and vacating the January 8, 1996 supplemental entry.

On July 22, 1996, the Bells filed a motion for leave to plead and file an amended answer, cross-claim, and third-party complaint. The trial court denied the motion on the grounds that the case had been concluded on its merits by a final appealable order and, therefore, lacked jurisdiction over the matter. [*5]

On July 30, 1996, the Bells filed a complaint (Case No. 21254) against Holden Survey, Inc. and Virgil and David Holden, individually, for fraud, negligence, and professional malpractice; against the Royers and John Doe insurance and title companies for breach of contract/warranty deed; and against the Jurkiewiczs, Lynchs, and Rays for a declaratory judgment ordering them to submit to new and proper boundary markings.

The Holdens filed a joint answer to the complaint on August 30, 1996. The remaining defendants filed answers to the complaint and each also asserted a cross-claim against Holden sounding in professional negligence/malpractice and seeking damages and indemnification if the Bells were successful in declaratory judgment ordering a redrawing of the boundary lines.

A pretrial conference was held on November 8, 1996, where it was decided to stay further proceedings pending Holden's completion of the corrective surveys as ordered in Case No. 20918.

On May 14, 1997, the Bells filed a motion for summary judgment against all defendants on the issue of declaratory leave and liability. On May 15, 1997, the Lynchs and the Rays filed a joint motion for judgment on the pleadings. [*6] The Bells filed a memorandum in opposition. Both motions were assigned for non-oral hearing.

On June 18, 1999, counsel for Holden filed a "notice of compliance" for Case No. 20918, demonstrating completion of the ordered corrective survey. The corrections affected not only the Bells' property but also that of the Rays', Lynchs', and Jurkiewiczs'.

On August 26, 1999, the trial court issued an opinion and judgment entry dismissing all of the Bells' claims. The court found that, based on the corrective survey conducted in Case No. 20918, the Bells' claims relating to the various boundary lines had been rendered moot. The court also found that the Bells' claims against Holden for professional negligence/malpractice, breach of contract, and negligent misrepresentation were barred because the applicable statute of limitations had expired. Further, the court found that any remaining claims asserted by the Bells were barred under the doctrine of *res judicata.* This appeal followed.

The Bells raise two assignments of error which will be addressed together. The Bells' first assignment of error states:

"The lower court erred in dismissing Case No. 21254 *sua sponte* on the grounds [*7] of mootness and *res judicata.* (Error reflected at pp. 208, 209, Opinion and Judgment Entry of 8/26/99)."

The Bells' second assignment of error states:

"The lower court erred in dismissing Case No. 21254 *sua sponte* on the grounds that the four-year statute of limitations had run against Holden. (Error reflected at p. 208, Opinion & Judgment Entry of 8/26/99)."

First, we will address the Bells' claims against the Jurkiewiczs, Lynchs, and Rays for a declaratory judgment ordering them to submit to new and proper boundary markings. The trial court found that the Bells' claims regarding the drawing of the boundary lines was moot. The Bells argue that the boundary dispute is not moot at all because the corrective survey did nothing to correct their situation.

In *Central Motors Corp. v. City of Pepper Pike (1983), 9 Ohio App. 3d 18, 19, 457 N.E.2d 1178,* the court held:

"Moot cases are dismissed because they no longer present a justiciable controversy. The requested relief has been obtained, it serves no further purpose, it is no longer within the court's power, or it is not disputed."

In this case, the Bells' claims regarding the drawing [*8] of the boundary lines are moot by virtue of Case No. 20918. On June 18, 1999, in Case No. 20918, counsel for Holden filed a "notice of compliance indicating that the supplemental and corrective survey work had been completed and approved by the court appointed surveyor. The Bells have lodged no objection to the corrective survey work nor have they appealed any orders in that case.

Next, we turn to the Bells' claims against Holden Survey, Inc. and Virgil and David Holden, individually, for fraud, negligence, and professional malpractice. The trial court ruled that these claims were barred by the statute of limitations and *res judicata.*

*R.C. 2305.09* provides a general limitations period of four years for tort actions not specifically covered by other sections of the Ohio Revised Code. That section states:

"An action for any of the following causes shall be brought within four years after the cause thereof accrued:

(A) For trespassing upon real property;

(B) For the recovery of personal property, or for taking or detaining it;

(C) For relief on the ground of fraud;

(D) For an injury to the rights of the plaintiff not arising [*9] on contract nor enumerated in *sections 2305.10* to *2305.12 2305.14* and *1304.35 of the Revised Code.*

"If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered."

General tort claims, including those for negligence, are governed by *R.C. 2305.09(D).* Likewise, general claims of professional negligence/malpractice not covered by *R.C. 2305.10* or 2305.11 are also governed by the four-year limitations period in *R.C. 2305.09. R.C. 2305.10* pertains to actions involving bodily injury or injury to personal property. *R.C. 2305.11* pertains to certain professional malpractice claims.

In *Investors REIT One v. Jacobs (1989), 46 Ohio St. 3d 176, 179-180, 546 N.E.2d 206,* the Ohio Supreme Court observed:

"Ohio courts have consistently interpreted *R.C. 2305.11(A)* restrictively and have refused to extend the statute to include professional [*10] malpractice claims which are neither considered specifically by the terms of the statute nor traditionally included under the common-law definition of 'malpractice.' See, *e.g., Hocking Conservancy Dist. v. Dodson-Lindblom Assoc. (1980), 62 Ohio St. 2d 195, 16 Ohio Op. 3d 217, 404 N.E.2d 164* (professional engineer); see, also, *Lombard v. Medical Center (1982), 69 Ohio St. 2d 471, 23 Ohio Op. 3d 410, 433 N.E.2d 162* (nurses and laboratory technicians); *Neilsen v. Barberton Citizens Hospital (1982), 4 Ohio App. 3d 18, 4 Ohio B. Rep. 39, 446 N.E.2d 209* (nurse); *Reese v. K-Mart Corp. (1981), 3 Ohio App. 3d 123, 3 Ohio B. Rep. 140, 443 N.E.2d 1391* (pharmacist)." (Footnote omitted.)

Surveyors are neither included specifically by the terms of *R.C. 2305.11* nor are they considered professionals subject to malpractice claims at common law. Therefore, *R.C. 2305.11* does not govern claims brought against surveyors for alleged professional misconduct.

2000 Ohio 2576; 2000 Ohio App. LEXIS 4586, *

The two-year statute of limitations contained in *R.C. 2305.10* has not been extended to include general negligence claims. *46 Ohio St. 3d at 180.* [*11] Therefore, *R.C. 2305.10* is not applicable to claims of negligence against surveyors.

We find that claims of surveyor negligence are governed by the four-year statute of limitations for general negligence claims found in *R.C. 2305.09(D)*, not by the two-year period for bodily injury or injury to personal property set forth in *R.C. 2305.10*, or by the one-year limitations period for professional malpractice claims in *R.C. 2305.11(A)*.

Although the Bells did not initiate this action until well over four years after Holden allegedly performed the incorrect survey, the Bells argue that actual damage did not ensue until July 1995 when Ladich sued the Bells over land put in dispute only once Ladich resurveyed in preparation for buying their parcel. In essence, the Bells are asking this court to apply the discovery rule, or what has been alternatively termed a "delayed damages" rule or "delayed occurrence of damages" rule.

"The 'discovery rule' generally provides that a cause of action accrues for purposes of the governing statute of limitations at the time when the plaintiff discovers or, [*12] in the exercise of reasonable care, should have discovered the complained of injury." *Investors REIT One, 46 Ohio St. 3d at 179.* However, the court also observed:

"The discovery rules adopted by this court and by the General Assembly for bodily injury claims brought under *R.C. 2305.10*, and the discovery rules determined in [ *Oliver v. Kaiser Community Health Found. (1983), 5 Ohio St. 3d 111, 449 N.E.2d 438* and [ *Skidmore & Hall v. Rottman (1983), 5 Ohio St. 3d 210, 450 N.E.2d 684*] for medical and attorney malpractice claims arising under *R.C. 2305.11(A)*, are not available to negligence claims brought under *R.C. 2305.09(D)*. However, *R.C. 2305.09(D)* expressly includes its own limited discovery rule:

"'If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered.'

"While expressly providing a discovery rule for certain actions arising under *R.C.*

*2305.09*, [*13] no such rule was extended to general negligence claims. The General Assembly's failure to include general negligence claims under the discovery rule set out in *R.C. 2305.09* argues strongly that it was not the legislature's intent to apply the discovery rule to such claims. See *Kirsheman v. Paulin (1951), 155 Ohio St. 137, 146, 44 Ohio Op. 134, 139, 98 N.E.2d 26, 31* (explaining the statutory significance of the Latin phrase, *expressio unius est exclusio alterius*). The legislature's express inclusion of a discovery rule for certain torts arising under *R.C. 2305.09*, including fraud and conversion, implies the exclusion of other torts arising under the statute, including negligence. See *id.*" *46 Ohio St. 3d at 181.*

Subsequently, the court has reevaluated and reaffirmed its holding in *Investors REIT One. Grant Thornton v. Windsor House, Inc. (1991), 57 Ohio St. 3d 158, 160, 566 N.E.2d 1220,* certiorari denied (1991), *502 U.S. 822, 116 L. Ed. 2d 57, 112 S. Ct. 84.* Thus, the Bells' argument that the trial court should have applied the discovery rule to their case is not persuasive. [*14]

Additionally, the "delayed damages" rule or "delayed occurrence of damages" rule has been rejected by a number of courts. *Fronczak v. Arthur Andersen, L.L.P. (1997), 124 Ohio App. 3d 240, 243-245, 705 N.E.2d 1283,* discretionary appeal not allowed (1998), *81 Ohio St. 3d 1502, 691 N.E.2d 1061; Hater v. Gradison Div. of McDonald & Co. Securities, Inc. (1995), 101 Ohio App. 3d 99, 110, 655 N.E.2d 189, 196,* discretionary appeal not allowed (1995), *72 Ohio St. 3d 1539, 650 N.E.2d 479; Riedel v. Houser (1992), 79 Ohio App. 3d 546, 549, 607 N.E.2d 894.* Thus, the Bells' argument that the trial court should have applied the delayed occurrence of damages rule to their case is equally unpersuasive.

In *Investors REIT One,* the Ohio Supreme Court explicitly stated that the four-year statute of limitations in *R.C. 2305.09(D)* which governs professional negligence claims begins to run when the alleged negligent act is committed. *Investors REIT One, 46 Ohio St. 3d at 182.* "By holding that the statue of limitations began to run 'when the allegedly negligent act was committed,' the court in *[Investors] REIT One* * [*15] * * meant exactly that: the date upon which the tortfeasor committed the tort, in other words, when the act or omission constituting the alleged professional malpractice occurred." *Hater, 101 Ohio App. 3d at 110.*

2000 Ohio 2576; 2000 Ohio App. LEXIS 4586, *

Applying the aforementioned precedent to the case at hand, it follows that the Bells' causes of action for professional negligence/malpractice commenced no later than May 1991, when Holden allegedly performed the incorrect survey. Since the Bells did not file these causes of action until July 1996, well after the four-year statute of limitations expired, those causes of action are accordingly barred.

However, the discovery rule set forth in *R.C. 2305.09(D)* is applicable to the Bells' cause of action against Holden for fraud. Since the incorrectness of the 1991 Holden survey was not discovered until 1995, that cause of action is not barred by the statute of limitations and the trial court erred in so ruling.

The trial court also found that the Bells' claims against Holden were barred under the doctrine of *res judicata*. The court's finding in this regard is problematic in several respects.

First, it must be noted that *res* [*16] *judicata* is an affirmative defense under Civ.R. 8(C) and, thus, cannot be the basis of a Civ.R. 12 motion on the pleadings. Being an affirmative defense, it necessarily involves information not required to be alleged in the pleadings and, therefore, could not be determined by looking only at the pleadings, as is required of a Civ.R. 12 motion. The defense should be raised initially by answer (Civ.R. 8[C]) and then by summary judgment motion. See *Indep. Ins. Agents of Ohio, Inc. v. Duryee (1994), 95 Ohio App. 3d 7, 11, 641 N.E.2d 1117; Nelson v. Pleasant (1991), 73 Ohio App. 3d 479, 482, 597 N.E.2d 1137; Toledo v. Thomas (1989), 60 Ohio App. 3d 42, 572 N.E.2d 867; Johnson v. Linder (1984), 14 Ohio App. 3d 412, 471 N.E.2d 815.*

In this case, Holden never filed a motion for judgment on the pleadings or summary judgment, let alone on the grounds of *res judicata*. Consequently, the Bells were never provided the opportunity to brief or argue that issue.

Despite the inappropriate procedural handling of the issue, the trial court's application of the doctrine was nevertheless improper in this case. The doctrine of *res* [*17] *judicata* involves both claim preclusion (historically called estoppel by judgment in Ohio) and issue preclusion (traditionally known as collateral estoppel). *Grava v. Parkman Twp. (1995), 73 Ohio St. 3d 379, 381, 653 N.E.2d 226.* The present case involves the claim preclusive aspect of *res judicata*. The rule as traditionally stated was that "A final judgment or decree rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction * * * is a complete bar to any subsequent action between the parties or those in privity with them." *Norwood v. McDonald (1943), 142 Ohio St. 299, 52 N.E.2d 67,* paragraph one of the

syllabus. This rule was subsequently expanded, however, to encompass not only identical causes of action but, "all claims which were or might have been litigated in a first lawsuit." *Grava* at 382. (Emphasis *sic.*)

The exact import of the phrase "claims which * * * might have been litigated" (sometimes written as "could" or "should" have been litigated) has not always been clear. The Supreme Court of Ohio touched on this issue in *Grava*. The court, adopting the doctrine of *res judicata* as stated in [*18] 1 Restatement of Laws 2d, Judgments, Sections 24 and 25, ultimately held, "A valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Grava,* syllabus.

However, as the Sixth District Court of Appeals observed in *Holzemer v. Urbanski, 1998 Ohio App. LEXIS 2149, *8 (May 15, 1998), Lucas App. No. L-97-1257, 1998 WL 259939* at *3 n1:

> In *Grava* and in sections 24 and 25 of the Restatement, the only type of claim preclusion under discussion was whether a plaintiff was barred from pursuing litigation based upon a claim arising out of a transaction which was the subject of a previously adjudicated matter. *Grava* provides little guidance to us in the application of the doctrine to a defendant's potential claim." (Footnote omitted.)

> n1 Affirmed on similar grounds in *Holzemer v. Urbanski (1999), 86 Ohio St. 3d 129, 712 N.E.2d 713.*

Furthermore, "despite the scope [*19] of preclusion created by *res judicata*, Ohio and other courts have recognized exceptions, particularly in the context of cross-claims that were not raised in previous actions. The plain language of Ohio's cross-claim rule reveals that claims against co-parties are permissive." *Harco Nat. Ins. Co. v. Smith, 1997 Ohio App. LEXIS 5389, *5 (Dec. 3, 1997), Wayne App. No. 97 CA0023, 1997 WL 772841* at *2. Specifically, Civ.R. 13(G) states:

> "A pleading *may* state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action.

2000 Ohio 2576; 2000 Ohio App. LEXIS 4586, *

Such crossclaim *may* include a claim that the party against whom it is asserted is or *may* be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant." (Emphasis added.)

In *Bargar v. Vari Systems, Inc., 1981 Ohio App. LEXIS 13965,* *4 (Sept. 17, 1981), Cuyahoga App. No. 42369, unreported, *1981 WL 4522* at *2, the Eighth District Court of Appeals held:

"This language of Rule 13(G) is not mandatory, but permissive. So, [*20] although [a party] may or may not assert a cross-claim at its option, it is not under a compulsion to do so. Since a cross-claim is always permissive, a failure to file a cross-claim does not result in waiver of the claim. *Augustin v. Mughal (8th Cir.1975), 521 F.2d 1215.*

"* * * Since [plaintiff's] claim was not a compulsory counterclaim but a permissive cross-claim, the trial court erred in barring [plaintiff's] charge against [defendant] * * *."

See, also, *Harco Nat. Ins. Co., 1997 Ohio App. LEXIS 5389,* *5-6, *1997 WL 772841* at *2.

The Bells and Holden were co-defendants in Case No. 20918. If the Bells had elected to sue Holden for fraud, that claim clearly would have been in the nature of a permissive cross-claim. Even if the doctrine of *res judicata* were applicable to the Bells' fraud claim, we have held before that the "doctrine should be qualified or

rejected when its application would contravene an overriding public policy or result in manifest injustice." *Westward Auto, Inc. v. Ohio Motor Vehicle Salvage Dealers Licensing Bd., 2000 Ohio App. LEXIS 306* (Jan. 18, 2000), Columbiana App. No. 98-CO-69, unreported, *2000 WL 126672* at *8, citing *Jacobs v. Teledyne, Inc.* (1988), 39 Ohio St. 3d 168, 171, 529 N.E.2d 1255. [*21] See, also, *Estate of Wagner v. Heavlin, 136 Ohio App. 3d 719, 737 N.E.2d 989, 2000 Ohio App. LEXIS 494 (2000), 2000 WL 179646.* Given the fact that Holden did not acquire the land to restore the Bells' property to its original size as agreed, disallowing the Bells to pursue their fraud claim against Holden would clearly result in manifest injustice.

Accordingly, the Bells' assignments of error are sustained in part and overruled in part.

Wherefore, the judgment of the trial court is hereby affirmed in part and reversed in part. The judgment of the trial court is affirmed to the extent that the Bells' causes of action against the Jurkiewiczs, Lynchs, and Rays for declaratory judgment requesting them to submit to new and proper boundary markings are barred under the doctrine of mootness, and that the Bells' causes of action against Holden for professional negligence/malpractice are barred by the statute of limitations. The judgment of the trial court is reversed to the extent that it dismissed the Bells' claim against Holden for fraud based on an expiration of the statute of limitations and, alternatively, the doctrine of *res judicata,* and this cause is remanded for further proceedings [*22] accordingly to law and consistent with this court's opinion.

Cox, J., concurs
Vukovich, J., concurs