**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SCOTT HUTCHISON
ENTERPRISES, INC., et al.,

                 Plaintiffs,

      v.                                    C-1- 01-776

RHODES, INC., et al.,

                 Defendants.

## <u>ORDER</u>

This matter is before the Court upon a motion for summary judgment filed by defendant H.T. Boggs (doc. 93). A hearing on the motion was held on January 19, 2005.  Plaintiffs subsequently filed a motion for partial summary judgment against defendant Boggs (doc. 110). That motion is also before the Court.

### I. Introduction

This action arises out of the sale of certain property by Boggs to the plaintiff corporation or partnership and the performance of technical investigation, consultation, and engineering services in connection with the transaction by defendants Rhodes, Inc., Rhodes Incorporated, and Rhodes and Associates, Inc. (collectively "Rhodes") and defendants H. Jack Geisler and James M. Zimmer.  Plaintiffs filed the original complaint in this action against defendants Boggs and Rhodes on November 8, 2001 (doc. 1), followed by an amended complaint against these defendants (doc. 19) and a second amended complaint against all defendants (doc. 75).

1

## II. Plaintiffs' factual allegations

Plaintiffs make the following allegations in the complaints that are pertinent to their claims against defendant Boggs: Plaintiff Scott Hutchison Enterprises, Inc. (Hutchison Enterprises) is a West Virginia corporation in the business of developing and owning real estate and other businesses. Plaintiff W.N. & Scott Hutchison Partnership (Hutchison Partners) is an Ohio general partnership organized and existing under the laws of Ohio. Boggs is an individual who resides in Florida, and who has no principal office, domicile, or business presence in the State of Ohio. The Rhodes entities are corporations organized and existing under the laws of the Commonwealth of Kentucky. Rhodes is in the business of providing professional engineering, geology, and drilling services, environmental assessments, and advice and counsel concerning the purchase and development of real estate. Zimmer and Geisler were employees of Rhodes at all pertinent times. There is complete diversity among the plaintiffs and Boggs and the other defendants.

The real estate that is the subject of this action is located in Lawrence County, Ohio. In October of 1999, plaintiffs and defendant Boggs entered into negotiations, and ultimately executed an agreement, for the sale to plaintiffs of the subject property then owned by Boggs. In connection with the agreement, Boggs represented to plaintiffs that the property contained no wetlands or other environmentally sensitive conditions or characteristics. Plaintiffs relied upon Boggs's representations in purchasing the property for development. Unbeknownst to plaintiffs, the real estate is alleged to have contained wetlands protected by state and federal law. Boggs knew or should have known that the property did contain wetlands, environmentally sensitive soils, and other characteristics that would prohibit development.

2

At all times pertinent to this action, and specifically prior to the closing of the sale of the subject real estate on December 6, 1999, and during the years 1995 through November of 1999, Boggs owned and operated a mobile home park and sales business on the property, which he called "Boggs Landing."  Another portion of the property was undeveloped at the time.  Some time during the time period 1997 through 1998, Boggs decided to expand the mobile home park by adding a new mobile home park development to be called "Boggs Landing Addition."  Boggs procured a professional design and layout of the proposed expansion, which showed it to be situated on the undeveloped portion of the real estate.  Some time during 1998, Boggs, operating as Boggs Landing, began clearing trees, excavating materials, and digging and filling on areas of the subject property that are now alleged to be "disturbed wetland."  Upon information and belief, after defendant Boggs, operating as Boggs Landing, had done substantial clearing and filling, Boggs was informed by the adjoining property owner that the area of the property that Boggs was clearing and filling was alleged to be a wetland area that could not be legally cleared or filled without compliance with state and/or federal regulations pertaining to such areas.  After receiving this information, Boggs stopped clearing and filling the area, withdrew all construction equipment from the site, and abandoned plans to construct a mobile home park addition on the property.  Upon information and belief, Boggs's action substantially disturbed, damaged, and disrupted portions of the subject property alleged to be wetlands.

After Boggs had received this information from the adjoining property owner, and prior to the closing on the property, Boggs made verbal representations to plaintiffs that the undeveloped portion of the subject property was "ideal" for development of a mobile home park. During this same time period, Boggs deliberately withheld from plaintiffs information that he

3

had abandoned his own plan for development of a mobile home park on the property after learning that the location was alleged to be a wetland where clearing and excavating could not likely be done except in compliance with state and federal regulations pertaining to wetland areas. In reliance upon Boggs's representations and upon the professional environmental and engineering information, consultation, advice, and warranties provided by defendants Rhodes, Zimmer and Geisler, plaintiffs purchased the property from Boggs.

After the closing on December 6, 1999, plaintiffs undertook preliminary work to develop the property, including clearing trees from the site. Unbeknownst to plaintiffs, the property contained wetlands and environmentally sensitive soils protected by state and federal law. The United States Corp of Army Engineers (the Corps) notified plaintiffs to cease and desist all further activities on the property and issued a formal Cease and Desist Order in May of 2000. Plaintiffs are unable to develop the property and are or may be obligated by law to perform remedial work on the property and/or to restore or replace environmentally sensitive aspects of the property. Plaintiffs have been damaged as a result. Since purchasing the property, plaintiffs have been informed of, and believe that they are obligated to comply with, regulations requiring mitigation and remediation of the disturbed wetland on the property.

Based on these allegations, plaintiffs bring claims against defendant Boggs for damage resulting from Boggs's "acts, omissions, breaches of warranty and misrepresentations" (First Claim) and for breach of contract and an agreement with plaintiffs (Second Claim).

4

### III. The motions for summary judgment

Boggs moves for summary judgment on all claims against him.  Boggs contends that plaintiffs' fraud claim is barred by the doctrine of *caveat emptor;* the record does not establish the elements of fraud; and the evidence does not support a finding that Boggs breached the parties' real estate agreement.

Plaintiffs move for partial summary judgment on the issue of Boggs's liability for fraud regarding the sale of the vacant land.  Plaintiffs claim that despite knowing that wetlands existed on the vacant lands, and in order to induce Hutchison to buy the vacant land, Boggs knowingly misrepresented to Hutchison that the vacant land could be developed into a mobile home park, that Boggs had begun developing the land into a mobile home park, and that the only reason Boggs had stopped the development was due to his age and the fact that he had moved to Florida.  Plaintiffs contend that while "Boggs's representation or concealment to Hutchison and the amount of Hutchison's damages may be disputed and considered a question of fact, according to Civ. R. 56(c), summary judgment may still be an issue on certain elements of Hutchison's fraud claim against Boggs even if there are material issues of fact on certain other elements of the fraud claim."  *See* Plaintiffs' motion for partial summary judgment, p. 2. Plaintiffs allege that the evidence shows that if Boggs made a representation to Hutchison and concealed information from him, the evidence indicates that the representation and concealment were material to the transaction at hand and the representation was made falsely, with knowledge of its falsity, and with an intent to mislead; Hutchison justifiably relied upon the representation and concealment; and Hutchison was injured as a result.

**IV. Facts**

The parties have not submitted proposed findings of fact and conclusions of law in support of their motions for summary judgment as required by the Court's Order of February 18, 2003 (doc. 37). The Court has therefore gleaned the material facts from the parties' briefs and the remainder of the record and will determine the motion based on the undisputed facts and the applicable law. The facts set forth below are undisputed unless otherwise noted.

Defendant H.T. Boggs is a now 84-year old individual who resides in Florida. Boggs depo., v. II, p. 6.[1] Plaintiff Hutchison Enterprises is an "S" Corporation that is 100% owned by W. Scott Hutchison (Hutchison), an experienced commercial real estate developer, and his wife, Laya Hutchison. Depo. exh. 61. Hutchison Enterprises is involved in the management and development of mini storage facilities, car washes, and mobile home parks. *Id.* Mitchell Klein is an attorney who assisted Hutchison with numerous commercial and other real estate transactions, including the transaction here and prior transactions. Klein depo. pp. 13-14. Robert Van Nostrand is a banker with Huntington National Bank who assisted Hutchison with numerous commercial real estate transactions, including the transaction at issue in this case. Van Nostrand has described Hutchison as one of the top five commercial real estate developers in the Huntington, West Virginia market and as "an experienced developer having built over 1,000 mini storage units, a mobile home park which is now in the lease-up phase, several car washes, and several commercial buildings." Van Nostrand depo. pp. 20, 65-66, 94; depo. exh. 68.

---

[1] Boggs' deposition was taken over two days. The transcripts for Day One and Day Two are referred to herein as v. I and v. II, respectively.

6

Prior to moving to Florida in the 1980s, Boggs lived in Huntington.  Boggs depo., v. I, p. 33; v. II, p. 10.  In the 1960s, Boggs purchased land in Burlington on the Ohio River.  That land is now occupied by the mobile home park and approximately 50 vacant lots located across from the park and Old U.S. Route 52.  Boggs depo., v. I, p. 17.  Some time during or before 1998, Boggs had a conceptual drawing of a mobile home park prepared.  Boggs depo, v. I, pp. 47-53; depo. exh. 181.  The drawing is  labeled "Boggs Landing Addition."  Depo. exh. 181.  Boggs never developed a mobile home park on the site of the vacant lots.

Hutchison contacted Boggs in the fall of 1999 about the possibility of purchasing the mobile home park.  Hutchison depo. pp. 31-32.  Eventually the two agreed on a purchase price of $1,000,000 for the park.  Boggs depo., v. II, p. 61.  Hutchison agreed to buy the vacant lots as well for a total purchase price of $1,100,000.  *Id.*

Van Nostrand agreed to lend Hutchison the money necessary to buy the mobile home park and vacant lots, but the commitment letter conditioned the bank loan on Hutchison obtaining a satisfactory Phase I environmental site assessment of the property.  Van Nostrand depo. p. 60.  Van Nostrand told Hutchison to be sure that the assessment covered wetlands issues because of where the property is located.  *Id*. at pp. 60-61; Hutchison depo. pp. 60-61; depo. exh. 60.

Boggs met with Hutchison in Ohio in October 1999 to discuss the proposed transaction.  Boggs depo., v. I, pp. 103-104.  The two had lunch together on October 19th.  *Id.*  The parties have offered differing versions of what happened at their meeting.  According to Hutchison, Boggs gave him a copy of the conceptual drawing labeled "Boggs Landing Addition," and Boggs told Hutchison that the vacant property was "a very developable piece of property" and

7

that Boggs had planned to put a mobile home park on the site. Hutchison depo. pp. 37-42, 46-47, 128. According to Boggs, he did not give Hutchison a drawing, but he did show Hutchison a United States Geological Survey (U.S.G.S.) map that shows the vacant lots and purportedly shows that portions of the vacant lots lie within a federal wetlands area. Boggs depo., v. II, pp. 45-49, 53-55; depo. exh. 200.

On October 20, 1999, Boggs and plaintiffs entered into a Real Estate Sales Agreement for the sale of the mobile home park and vacant lots. Depo. exh. 195. The Agreement included among the "Conditions Precedent to the Obligations of Purchaser" the requirement of a "Satisfactory Level One EPA Study, to be performed before December 1st, 1999." Para. 5(2). At this time, Attorney Daniel Konrad, who was representing Boggs, mentioned to Hutchison that WalMart had experienced a problem with "environmentally sensitive" land down the road and that Konrad had no idea whether the property that Hutchison was purchasing from Boggs had a problem. Konrad depo. pp. 53-54. In fact, Hutchison knew that there was a wetlands problem at the WalMart site less than one-half mile down the road from Boggs's mobile home park. Hutchison depo. pp. 57-58.

Hutchison contacted Rhodes, Inc., and he hired the company to perform an environmental study of the property. Hutchison depo. pp. 63, 80; depo. exh. 92. He purportedly instructed Rhodes to make sure that there were no wetlands on the property. *Id*. at p. 59. On October 28th, Rhodes issued a preliminary report to Van Nostrand, which found that other than some "unlawful dumping of building debris," no "recognized environmental conditions were revealed in respect to the undeveloped tract during the site reconnaissance and record search." Depo. exhs. 63, 134. The final written assessment by Rhodes is dated November 8, 1999. Depo.

exhs. 71, 135.

Klein began drafting a contract for the sale of the mobile home park and vacant lots to Hutchison Enterprises.  The terms of the contract were worked out between Klein on behalf of Hutchison Enterprises and Konrad on behalf of Boggs.  Hutchison depo. p. 66; Konrad depo. p. 16; depo. exhs. 10, 11, 14, 15, 16, 17, 18, 19, 20.  Because Konrad was familiar with the WalMart situation, he made changes to language in Klein's draft pertaining to the fact that Boggs was not making any representations regarding the "hydric soil" conditions of the property.  Konrad depo. pp. 49-53.  The final contract dated October 20, 1999, includes the following language in this regard as a condition precedent to the obligations of the purchaser:

> Seller will execute an affidavit stating that . . . To the best of . . . Seller's knowledge . . . there is no known evidence of 'hydric soils' on the property except in areas which may be environmentally sensitive.  'Hydric soils' shall mean any soil category upon which building would be prohibited or restrictive [sic] under applicable governmental requirements, including those imposed by the United States Army Corps of Engineers.

Depo. exh. 195.

The closing occurred on December 6, 1999.  Title to the property was taken in the name of Hutchison Partnership.  After he had purchased the property, Hutchison began clearing the vacant lots.  Hutchison depo. p. 135.  He hired Thomas Company, an engineering firm, to design a mobile home park to be constructed on the vacant property.  *Id*. at p. 152.  Andy Lockwood, a design engineer employed by Thomas Company on the project, suspected that portions of the property would be considered wetlands and in April 2000 contacted the Corps (doc. 166), who looked at the site.  The Corps informed Hutchison that the discharge of dredged material at the site had not been approved by a Department of the Army permit as required under the Clean Water Act.  Depo. exh. 99.  In a letter dated May 3, 2000, the Corps directed Hutchison to cease

9

further dredge and fill activities at the site.  *Id.*

During the solicitation of public comment as part of the permitting process for the construction project, several individuals and organizations asserted that the vacant lots are the habitat of certain endangered species, including the Cross-Vine Begnonia Capreolata and the Eastern Spadefoot Toad, and objected to any development of the site.   Depo. exhs. 98, 101, 102, 169.  Scientists have observed the site but it has not been determined to date if the Eastern Spadefoot Toad is present on the site.  Tammy Fudge depo. pp. 85-86.

On September 25, 2000, Hutchison Partnership sold the mobile home park and vacant lots to Hutchison Enterprises for $1,215,000, which represented a $115,000 profit over the 1999 purchase price.  Laya Hutchison depo. pp. 56, 58; depo. exh. 108.

### V. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action.  This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to

10

decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249 (citing *Cities Serv.*, 391 U.S. at 288-289). The Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as matter of law." *Id.* at 251-52. If the evidence is merely colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

## VI. Opinion

### A. Claim for damages resulting from Boggs's alleged acts and misrepresentations

The Court will initially determine whether plaintiffs have come forward with sufficient evidence to create a genuine issue of material fact as to whether Boggs is entitled to summary judgment as a matter of law on plaintiffs' claim that they have "been damaged . . . as a result of the acts, omissions, breaches of warranty and misrepresentations of Boggs." Boggs contends that the second amended complaint does not identify any alleged breaches of warranty by Boggs. Boggs also argues that there is no evidence that he misrepresented or concealed anything about the vacant lots.

### 1. Applicable law

The parties agree that Ohio law governs their dispute. Ohio applies the doctrine of *caveat emptor* to sales of real estate with regard to conditions that are open to observation. *Layman v. Binns*, 35 Ohio St.3d 176, 177, 519 N.E.2d 642, 643 (1988) (citing *Traverse v. Long*, 165 Ohio St. 249, 252, 135 N.E.2d 256, 259 (1956)). Ohio law provides that when these

conditions "are discoverable and the purchaser has the opportunity for investigation and
determination without concealment or hindrance by the vendor, the purchaser has no just cause
for complaint even though there are misstatements and misrepresentations by the vendor not so
reprehensible in nature as to constitute fraud." *Id.* at 177, 519 N.E.2d at 643-44 (citing *Long,*
165 Ohio St. at 252, 135 N.E.2d at 259).  The following conditions must be satisfied in order for
the doctrine to apply: "(1) the defect must be open to observation or discoverable on reasonable
inspection, (2) the purchaser must have an unimpeded opportunity to examine the property and
(3) the vendor may not engage in fraud."  *Id.* at 177, 519 N.E.2d at 644.

In order to establish a claim of fraud under Ohio law, a plaintiff must prove the following
elements: "a) a representation or, where there is a duty to disclose, concealment of a fact, b)
which is material to the transaction at hand, c) made falsely, with knowledge of its falsity, or
with such utter disregard and recklessness as to whether it is true or false that knowledge may be
inferred, d) with the intent of misleading another into relying upon it, e) justifiable reliance upon
the representation or concealment, and f) a resulting injury proximately caused by the reliance."
*Burr v. Bd. of County Com'rs of Stark County,* 23 Ohio St.3d 69, 73, 491 N.E.2d 1101, 1105
(1986).

A party must prove not only that he acted in reliance on a material misrepresentation, but
also that he had a right to do so.  *Columbia Gas Transmission Corp. v. Ogle,* 51 F.Supp.2d 866,
875 (S.D. Ohio 1997) (Graham, J.).  Reliance is "that degree of care which would be exercised in
an average transaction between persons under similar circumstances. . ."  *In re Landon,* 37 B.R.
568, 571 (Bnkrptcy. N.D. Ohio 1984)  Factors to be considered in determining whether reliance
is reasonable include "the nature of the transaction, the form and materiality of the

12

representation, the relationship of the parties, the respective intelligence, experience, age and mental and physical condition of the parties, and their respective knowledge and means of knowledge." **Ogle,** 51 F.Supp.2d at 875 (citing Ohio cases). An individual "has no right to rely on misrepresentations when the true facts are equally open to both parties." **Id.** at 875-76 (citing **Aetna Ins. Co. v. Reed,** 33 Ohio St. 283 (1877); **Van Horn v. Peoples Banking Co.,** 64 Ohio App.3d 745, 582 N.E.2d 1099 (1990)).

As a general rule under Ohio law, an individual "is expected to conduct his or her dealings with proper vigilance." **Dito v. Wozniak,** 2005 WL 19437 * 4 (Ohio App. 9 Dist.) (citing **Foust v. Valleybrook Realty Co.,** 4 Ohio App.3d 164, 165, 446 N.E.2d 1122 (1981); **In re Landon,** 37 B.R. at 570 (citing 24 Ohio Jur.2d *Fraud and Deceit* § 136). "Such vigilance imputes a duty upon one to reasonably investigate the truth of representations made prior to reliance thereon." **Dito,** 2005 WL 19437 * 5; **see also Foust,** 4 Ohio App.3d at 165, 446 N.E.2d at 1125 (where an individual "is put on notice as to any doubt to the truth of the representation," the person has a duty to reasonably investigate before relying on the representation). Once a buyer is aware of a possible problem, he has a duty to "either (1) make further inquiry of the owner, or (2) seek the advice of someone with sufficient knowledge to appraise the defect." **Dito,** 2005 WL 19437 *5 (citations omitted). An individual must avail himself of information that is easily accessible to him. **In re Landon,** 37 B.R. at 570 (citing 24 Ohio Jur.2d *Fraud and Deceit* § 136). "Where representations are made regarding certain aspects of a real estate transaction which are subject to inspection and verification by the purchaser, and where they have had an opportunity to investigate, a purchaser will not have a cause of action for fraud even though the representations are untrue." **Id.** (citing **Traverse,** 165 Ohio St. 249, 134 N.E.2d 256;

13

*Ralston v. Grinder*, 8 Ohio App.2d 208, 221 N.E.2d 602 (1966)).

**2. Plaintiffs' arguments in support of their fraudulent misrepresentation claim**

Plaintiffs allege that Boggs made certain representations to them regarding the subject property that were false. Plaintiffs allege that Boggs informed Hutchison that the vacant land on the north side of the property "would be ideal for the development of an additional mobile home park;" that Boggs had looked into such a development, he had plans and estimates, and he had actually started clearing land, but his interest had waned due to his age and the fact that he had moved away from the area and had taken up residence in Florida; and that Boggs gave plaintiff a copy of plans and drawings for the development of a new mobile home park to be known as "Boggs Landing Addition" and some other information and told plaintiffs that he had bids and proposals for excavation and development work. *See* Plaintiff's opposing memorandum, pp. 3-4. Plaintiffs summarize Scott Hutchison's deposition testimony that they believe to be material to their claims of misrepresentation and fraud as follows:

> [Hutchison] testified on deposition that Boggs led him to believe he could put in a mobile home park addition to Boggs Landing with no problems whatsoever; that Boggs showed him and gave him the plans for it, and gave him an estimate Boggs had received from an excavation company; that Boggs told Hutchison that he could start on the project immediately and go forward with it, and that the only reason he "Boggs" had not developed it was that he relocated to Florida and was too old to have an interest in completing the project.

Plaintiffs' opposing memorandum, p. 4. Plaintiffs claim that they entered into a written purchase agreement with Boggs dated October 20, 1999, which called for a closing on or before December 15, 1999, in reliance on Boggs's representations "that the vacant land would be ideal for development of an additional mobile home park." *See* Plaintiffs' opposing memorandum, p. 6.

As evidence that Boggs's representations were false, plaintiffs rely on deposition

14

testimony by Boggs denying that he had ever intended to build a "Boggs Landing Addition" and also denying that he had ever seen documents relating to such a plan, when in fact those documents were produced from Boggs's own records and included correspondence and proposals addressed to Boggs for work to be performed on the project.  Plaintiffs allege that the fact that Boggs denied having received or seen any of the project proposal documents taken from his own files shows his testimony to be incredible.

Plaintiffs further rely on the deposition testimony of Thaddeus Blatt, president of a company that owned land immediately to the west of Boggs's vacant land where the wetlands exist, who testified as follows: Blatt had an environmental inspection performed on his company land some time around 1996 and had discovered wetlands issues on the land.  When he subsequently observed activity on Boggs's vacant land, which included filling, bringing in truckloads of dirt, use of a bulldozer, knocking down trees, and clearing the land, Blatt spoke to an individual on Boggs's property who introduced himself as Boggs's foreman.  The man gave Blatt a business card on which was printed "Boggs Landing Mobile Homes" and the name "Dewey Jalanovich" with the title of "Sales Manager."  Depo. exh. 160.  Blatt asked the man if the property owner had conducted a wetland survey, and the man said no.  Blatt suggested to the man that he should have a wetland survey and told him that Blatt had to have a wetland survey done on his land.  Shortly after Blatt's conversation with Jalanovich, the work clearing Boggs's vacant land stopped and did not resume.  Blatt depo. pp. 23-25, 40-46.

Plaintiffs allege that Blatt's conversation with Jalanovich, coupled with the timing of proposals for Boggs's development of the subject property made less than four months prior to the date on which Boggs agreed in writing to sell the land to plaintiffs, lead directly to the

15

conclusion that Boggs learned of the wetlands issue when Blatt "warned" Jalanovich. *See* Plaintiff's opposing memorandum, p. 9. Plaintiffs claim that this evidence supports and corroborates Hutchison's testimony that "Boggs induced him to purchase the property by representations that it would be ideal for the development of an additional mobile home park, while withholding information that there were wetlands issues on the land." *See* Plaintiffs' opposing memorandum, p. 10. Plaintiffs conclude that the deposition testimony, "together with Mr. Boggs's denial that he had or knew of any information about the proposed development, proposals, or plans, demonstrates that Mr. Boggs['s] testimony is not reliable and a jury issue exists on the Plaintiffs' claims against him." *Id.* at pp. 10-11.

### 3. Resolution of the fraud claim

Plaintiffs' claim that they have been damaged as a result of Boggs's acts, omissions, and misrepresentations is properly construed as a claim for fraudulent misrepresentation and concealment. The Court has carefully considered the parties' positions as presented in their briefs and at oral argument, the deposition testimony, and the exhibits that are before the Court to determine whether plaintiff has come forward with sufficient evidence to show the existence of a genuine issue of material fact as to this claim. After its review of the record, the Court concludes for the reasons set forth below that there is no genuine issue of material fact underlying resolution of plaintiffs' fraudulent misrepresentation and concealment claim against defendant Boggs and that Boggs is entitled to summary judgment on the claim as a matter of law.

As to the first element of plaintiffs' fraud claim, the Court must assume for purposes of summary judgment that Boggs failed to disclose the existence of wetlands on the vacant lots

across from the existing mobile home park and that he made certain representations to Hutchison

pertaining to the sale of the vacant lots. Specifically, the Court must accept as true Hutchison's

testimony regarding both Boggs's representations as to the suitability of the land for a mobile

home park and the reasons that Boggs gave for not following through with plans that he had

pursued for development of a mobile home park on the site. Hutchison gave the following

testimony regarding these representations:

> He led me to believe that I could put this mobile home [park] in with no problems
> whatsoever. He has already had - - he showed me and gave me plans for it,
> showed me the estimate that he received from Southern Excavation, and told me
> that I could start on this thing immediately and go forward and the only reason he
> wasn't doing it was because [of] the distance and his age."

Hutchison depo. p. 132.[2] Hutchison testified that Boggs told him that "he actually did start the

construction there, as far as moving some trees, and he quit and he decided that he did not have

the time and because of the distance and he was getting old - - he was going to be 80 years old I

believe that year - - that he did not want to fool with it." *Id.* at p. 43.

Accepting as true Hutchison's testimony that Boggs made these representations, a

reasonable jury could find that the representations were material to plaintiffs' decision to

purchase the land so as to satisfy the second element of a fraud claim. The suitability of the land

for its intended use obviously could have impacted the purchase decision so that this

representation may be deemed to be material to the sales transaction. A reasonable jury could

further find that in deciding whether to purchase the vacant land, the purchaser would take into

---

[2] Plaintiffs assert in their opposing memorandum that Boggs told Hutchison that the vacant land would be "ideal" for development of a mobile home park, a claim that Boggs denies. See Boggs. depo., v. I, p. 108. Plaintiffs have not cited any deposition testimony to support their assertion that Boggs made this specific representation, and so the Court will rely on the actual deposition testimony provided by Hutchison as to the representations that Boggs made to him.

account the fact that the seller had drawn up plans for developing the site and had begun to clear the land for that purpose. Accordingly, there is sufficient evidence to support a finding in plaintiffs' favor on the second element of their fraud claim.

Third, with respect to the truth or falsity of Boggs's representations, a reasonable jury could find that the representation that the land was suitable for development was not true based on the fact that the existence of jurisdictional wetlands on the property has precluded development of the site for any purposes to date. Whether Hutchison has adduced sufficient evidence to support a finding that Boggs's stated reasons for abandoning his plans to develop a mobile home park on the site were false is addressed below in conjunction with the knowledge element of the fraud claim.

Turning to the knowledge element, plaintiffs have made inconsistent arguments as to when Boggs first learned of the wetlands on the vacant land. In their memorandum in opposition to Boggs's motion for summary judgment, plaintiffs argue that Boggs first learned of the wetlands issue when Blatt "warned" Jalanovich, and they ignore any deposition testimony that could conceivably constitute an admission by Boggs of earlier knowledge of wetlands on the property. In their motion for partial summary judgment, plaintiffs assert that Boggs discovered that there were wetlands on the vacant land some time during the 1980s. Boggs admits that he was aware of wetlands on his property in the 1980s, but he claims that he disclosed this information to Hutchison prior to the closing by showing him a U.S.G.S. map indicating that a portion of the vacant lots lie within a federal wetlands. Boggs's depo., v. II, pp. 45-47, 53-54; v. I, pp. 109-113, 118. Boggs, however, would apparently have the Court disregard his admission and accept as true for purposes of the present motion Hutchison's version of his conversation

18

with Boggs, which does not include a representation that Boggs told him about the existence of wetlands on the property. The Court will disregard for the moment Boggs's admission that he became aware of federal wetlands on his property in the 1980s and address plaintiffs' argument that Boggs learned of wetlands issues when Blatt "warned" Jalanovich.

The evidence does not permit a reasonable fact-finder to infer from Boggs's cessation of activity on the vacant property following the conversation between Blatt and Jalanovich that Boggs became aware of a wetlands issue on his property as a result of the conversation and ceased his activities on the property for that reason.  First, the only evidence regarding the conversation is Blatt's deposition testimony that he informed Jalanovich that he had discovered wetlands issues on his own property in 1996 and he suggested to Jalanovich that he should have a wetlands survey done.  Blatt testified that he asked Jalanovich,

> if the property owner had had a wetland survey, and he said no.  And I said, well, I just suggested that, so I said I had to.  I said maybe you do or maybe you don't. That's up - - you know, but I suggested to him that it should be done.  And whether they did or did not, I have no idea.

Blatt depo. pp. 43-44.  There is no testimony or other evidence that Blatt conveyed to Jalanovich any information about wetlands issues on *Boggs's* property.  At most, the testimony shows that Blatt raised the *possibility* that there could be wetlands on Boggs's property, a possibility that was known to Hutchison before the closing as explained below.  Nor is there any evidence in the record to indicate that Jalanovich informed Boggs of his conversation with Blatt or that Boggs otherwise learned of the conversation.  Absent such evidence, a reasonable jury could not infer that Boggs ceased conducting activity on the land because he had learned of wetlands issues on his property rather than for the reasons he gave Hutchison.

There is, however, other evidence that permits a finding that Boggs knew prior to the

19

closing of the existence of wetlands on the vacant land, which would preclude or hinder development of a mobile home park on the site. This evidence takes the form of Boggs's deposition testimony as summarized at page 7, footnote 5 of his motion, that he knew of wetlands on the vacant property in the 1980s. One could reasonably deduce from the fact that there were wetlands on the property that development of the property for any purpose might be hampered, thereby permitting an inference that Boggs knew at the time of the real estate transaction that the property was not suitable for development of any type and that his representation to the contrary was false. The evidence is also sufficient to permit a jury to infer that Boggs made the representation with the intention of misleading Hutchison into relying upon it since Boggs made the purported representation in the context of negotiating the sale of the property.

The question then becomes whether the evidence permits a finding that Hutchison reasonably relied upon Boggs's representations. Plaintiffs claim that they justifiably relied on both the information provided by Boggs and his concealment of the fact that there was a problem of wetlands on the vacant property. Plaintiffs allege that it cannot be said that they "could and should reasonably have discovered for [themselves] the conditions of hydric soils and plant species present on the land which caused the Army Corps. of Engineers to stop work in May of 2000."[3] *See* Plaintiffs' opposing memorandum, p. 12. Plaintiffs assert that "At most, how discoverable these issues were and the sufficiency of [Hutchison's] own inquiry and efforts may become an issue for the jury." ***Id.***

---

[3] The Court need not address any issues concerning the presence of protected plant or animal species on the vacant land since plaintiffs do not claim that anyone deceived them about the existence of any such species on the land prior to the sale of the property. See Hutchison depo. p. 156.

20

Although the issue of whether Hutchison's reliance was reasonable is necessarily a fact-intensive inquiry, the Court finds that submission of the issue to a jury is not warranted in this case. Rather, the Court finds for the reasons stated below that if the facts and all reasonable inferences to be drawn therefrom are construed in favor of plaintiffs, there is only one conclusion that can reasonably be drawn: Plaintiffs' reliance on Boggs's representations was not justifiable.

Initially, the Court finds that the evidence shows that Hutchison was well aware of the existence of wetlands in the vicinity of the mobile home park and of the possibility that there were wetlands on the vacant property prior to his purchase of the property, and no reasonable jury could determine otherwise. Hutchison admitted at his deposition that he remembered something about wetlands problems when WalMart had tried to build less than half a mile from Boggs's property. Hutchison depo. pp. 57-58. Hutchison also testified that before he purchased the property, first Van Nostrand and later Konrad raised the issue of wetlands on the property. Specifically, Hutchison testified that the possibility of a wetlands issue had occurred to him after Van Nostrand informed him that he had to have a Phase I environmental assessment done in order to get the loan from the bank and told him to make sure that the assessment covered wetlands issues because of where the property is located. Hutchison depo. pp. 58-61. Hutchison testified that he knew after Van Nostrand told him that it was necessary to get a Phase I environmental assessment that he needed to look for "floodplain and the wetlands." *Id.* at pp. 72-73. Van Nostrand testified to similar effect, stating that he had talked to Hutchison about getting an environmental assessment and that he had told him that it had to address wetlands. Van Nostrand depo. pp. 60-61. In addition, Konrad testified that he mentioned to Hutchison on October 20, 1999, that WalMart had experienced a wetlands problem down the road and that

21

Konrad had "no idea, no clue whether or not the property that he was purchasing from Mr.

Boggs had a problem." Konrad depo. p. 54. Konrad testified that Hutchison told him not to

worry about it, that the bank was requiring Hutchison to have an environmental study done on

the property, and that a request had been made that the wetlands issue be part of the study. *Id*.

Hutchison testified that plaintiffs engaged Rhodes to perform an environmental study and

specifically requested that Rhodes ascertain whether there were wetlands on the property.

Hutchison depo. pp. 80-82.

Finally, the parties recognized that there might be an issue concerning the existence of

wetlands on the property by including a provision in the contract that Hutchison acknowledged

was added by his lawyer in order to protect him in case there were some wetlands issues.

Hutchison depo. pp. 68-73.[4]

Having known of the possibility of a wetlands issue prior to the purchase of the property,

there was no bar to Hutchison discovering the true facts about the property on his own. This is

true whether the existence of wetlands on the property is characterized as a patent defect, or

whether it is characterized as a latent defect as plaintiffs argued at the summary judgment

hearing and implicitly in their reply memorandum in support of their summary judgment motion,

wherein plaintiffs state:

> In fact, the existence of a jurisdictional wetland can be determined only by a
> scientific assessment to ascertain the presence of three criteria: hydric soils,
> hydrophitic vegetation, and hydrology.

If the defect was latent in the sense that wetlands could not be detected by a visual inspection of

---

[4] The provision states that "To the best of Seller's knowledge, . . . there is no known evidence of 'hydric soils' on the property except in areas known by the Seller and Purchaser to be environmentally sensitive."

the site, then an individual seeking to determine if wetlands existed on the property would have to review public records and maps in order to make this determination.  No one posits that information of this nature was not equally available to all parties and to the public as a whole. No one alleges that Hutchison was barred in any manner from conducting a records search and examining maps of the area to find any existing information on the condition of the property.

Conversely, if the defect was patent in the sense that it could be visually observed, then Hutchison could have discovered the defect on his own by inspecting the land.  The evidence shows, however, that Hutchison did not conduct a reasonably thorough inspection of the land. Rather, when asked at his deposition whether he had stepped foot on the land before he bought it, Hutchison replied that he "didn't walk into it.  I stepped out on the front of the property, maybe walked around in the front."  Hutchison depo. p. 36.  Hutchison also testified that he did not "walk the perimeter of the land," that he did not walk up along the boundary with the Navy Trucking land, and that he did not look at the end of the land along U.S. 52 because he "was afraid [he'd] get snakebit."  Hutchison depo. pp. 36-37.  There is no allegation that anyone attempted to preclude Hutchison from performing a more thorough inspection of the land or that there were any barriers to his doing so.

In light of the undisputed evidence showing that Hutchison was well aware before the purchase of the vacant lots was completed of the possibility that there may be wetlands on the property, Hutchison was under a duty to investigate that possibility and to avail himself of information that was easily accessible to him regarding the issue.  By his own admission, Hutchison did not undertake his own investigation but instead chose to rely on the alleged misrepresentations and concealment of the true facts by Boggs, together with the environmental

23

assessment conducted by Rhodes.  Hutchison asserts that,

> Since [he] believed Boggs and there were no zoning requirements, [he] did not inquire into the history of the Property, inquire into the character of the Property, look at any government maps of the Property or look at any official information about the property.

*See* Plaintiff's Motion for Partial Summary Judgment, p. 13; Hutchison depo. pp. 50, 54.  He testified that he believed "every word that came out of [Boggs's] mouth."  Hutchison depo. pp. 74-76.

It is therefore clear that the evidence permits one of only two possible conclusions as to whether Hutchison satisfied his duty to reasonably investigate the truth of the representations that Boggs purportedly made to him before relying on those representations: either (1) Hutchison failed to fulfill his duty by not properly investigating the facts for himself and instead relying on Boggs's representations that the land was suitable for development, or (2) Hutchison did fulfill his duty by retaining Rhodes, Inc. to complete an environmental assessment of the property with specific instructions to look for wetlands and to cover that issue in the report.  If the former conclusion is reached, then Hutchison's reliance on Boggs's representations cannot be deemed to be reasonable.  ***See, e.g., Gentile v. Ristas,*** 160 Ohio App.3d 765, 785, 828 N.E.2d 1021, 1036 (2005) (having been put on notice of potential water problems in connection with purchase of home, the plaintiffs could not have justifiably relied on the sellers' alleged nondisclosures and misrepresentations relating to those potential problems).  If the latter conclusion holds true, then a finding of justifiable reliance on Boggs's representations cannot be made since Boggs, a nonexpert, cannot be held to a higher standard of knowledge and a higher duty to disclose than Rhodes, an expert purportedly hired by plaintiffs for the specific purpose of ascertaining the presence of wetlands on the site.

Considering all of the evidence of record then, a reasonable jury could not find that Hutchison's alleged reliance on Boggs's representations was justifiable. Plaintiffs have not presented evidence indicating that Boggs was privy to confidential information regarding the site or that he had ever had an environmental assessment performed. Rather, the evidence shows that the true facts as they existed at the time of the sale were equally open to both Boggs and Hutchison. Hutchison, however, failed to avail himself of information that was accessible to him in order to discover the true facts, choosing instead to rely on Boggs's representations and the environmental assessment prepared by Rhodes, Inc. While reliance on the Rhodes report may well have been justified, reliance on Boggs's representations clearly was not. Hutchison is a highly-experienced and sophisticated real estate developer who stood on equal footing with Boggs in regard to the parties' transaction. Hutchison cannot hold Boggs liable for fraud based on Hutchison's failure to investigate the facts for himself or on the possible negligence of a third party. Nor can Boggs be held liable for failing to disclose facts that Hutchison argues did not exist at the time of the closing, most particularly that the site was a jurisdictional wetlands.[5] For these reasons, plaintiffs' fraud claim against Boggs must fail.

Insofar as plaintiffs seeks damages for misrepresentations by Boggs that fall short of fraud, those claims are barred by the doctrine of *caveat emptor*. For the reasons discussed above, any information that Boggs had regarding the existence of wetlands on the vacant property was discoverable by plaintiffs and the record shows that plaintiffs had an unimpeded

---

[5] Plaintiffs argued at the summary judgment hearing that a determination of jurisdictional wetlands was not made until after the sale of the property in the year 2000 and that the presence of symbols on the U.S.G.S. maps that were available for review by the public at the time of the sale are not the equivalent of a jurisdictional wetlands determination.

25

opportunity to discover such information.  Accordingly, plaintiffs may not pursue a cause of action for representations by Boggs that do not constitute fraud.

**B. Breach of the Real Estate Sales Agreement/Breach of warranty**

Boggs alleges that plaintiffs' breach of contract claim must fail because (1) the contract includes a disclaimer at ¶ 5(1) regarding "environmentally sensitive" areas; (2) the contract makes clear that both Boggs and Hutchison were relying on Rhodes to make sure that the real estate was "satisfactory" from an environmental standpoint, so that Rhodes's environmental study constitutes a supervening or intervening event; (3) Hutchison Enterprises failed to obtain liability insurance for Boggs as required by ¶ 9 of the contract; and (4) neither Hutchison Enterprises nor Hutchison Partners suffered any damages.  Plaintiffs do not address the breach of contract claim in their memorandum in opposition to summary judgment.  Nor have plaintiffs addressed their claim for breach of warranty against Boggs.  Having failed to point to evidence that supports these claims, the claims cannot withstand summary judgment.

## VII. Conclusion

In accordance with the foregoing, plaintiffs' motion for partial summary judgment is **DENIED.**  Defendant Boggs's motion for summary judgment (doc. 93) is **GRANTED.** Plaintiffs' claims against Boggs are **DISMISSED**.  Defendant Boggs is **DISMISSED** from the lawsuit at plaintiffs' cost.

**IT IS SO ORDERED.**


S/ Herman J. Weber
                        HERMAN J. WEBER
            SENIOR JUDGE, UNITED STATES DISTRICT COURT


J:\HJWA\01-776boggsmsjPUB.wpd