UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Scott Hutchison Enterprises, Inc., et al.   :   CASE NO: C-1-01-776
:
Plaintiffs                                  :   Judge Weber
:
vs.                                         :
:
Rhodes, Inc., et. al.                       :
:
Defendants.                                 :

### EXPERT REPORT OF DONALD A. FAY C.P.G.

This is the report of Donald A. Fay, C.P.G., (C.V. attached) to provide expert analysis and opinions regarding the environmental assessment done by Rhodes, Inc. on property in Burlington, Ohio and its report prepared for Scott Hutchison, Scott Hutchison, Inc. regarding an undeveloped 13.37 acre tract of land.

### FACTS REVIEWED AND CONSIDERED

1.   Rhodes, Inc. ("Rhodes") made a written proposal to Scott Hutchison dated October 20, 1999. The proposal letter was described as a "Phase I Environmental Assessment" on two parcels of property, and was signed by Adonis "Doni" F. Spivey, Environmental Consultant, and James M. Zimmer, P.G., Project Geologist, on behalf of Rhodes. The proposal is attached to this report, and is identified as Exhibit 132 in deposition exhibits.

Of particular interest, the letter states, "A Phase I Environmental Assessment includes, but is not limited to the following:

1

> "Review available information on the geographic area and the geologic and hydrologic conditions present."
>
> "Examine adjacent and surrounding properties of both sites for potential environmental hazards impacting on the site."
>
> "Prepare a report combining the findings of both tracts and making any needed recommendations."

The proposal was accepted by Scott Hutchison the same day.

2.    In addition to **Exhibit 132**, *Hutchison gave Rhodes specific verbal instructions to include the issue of wetlands as part of the assessment. He testified in his deposition pp 81-83) that he told Adonis Spivey, his contact person with Rhodes, that he needed to know whether or not there were any wetlands issues before closing on the property. He told her that in a telephone conversation, even before Exhibit 132 (the Rhodes proposal) was submitted to him.* **Hutchison Deposition p. 82**.

3.    On October 28, 1999, Rhodes wrote a letter to Bob VanNostrand, Vice President of the Huntington National Bank, (loan officer financing the purchase) which was faxed to him on that date described as a "preliminary letter for the Phase I Environmental Assessment of proposed acquisition for Scott Hutchison." The covering fax page and attached "preliminary letter" are **Exhibit 134** and are attached. The preliminary report made no findings of wetlands or other environmentally sensitive features on the site.

4.    A final document entitled "Report of Phase I Environmental Site Assessment of Two Tracts" is dated November 8, 1999 and is **Exhibit 135**. Pertinent aspects of that

2

document include the following:

    A statement that the investigation included:

    a. A specific statement on page one of **Exhibit 135**, as follows: "The following is our report of this investigation which included:

"Review of published historical, geological, topographical, and soil maps **to identify** any pipelines, high tension lines, streams, springs, surface water bodies, flood plains, sinkholes, faults, **wetlands, or other environmentally sensitive features.**"

b. On page 6 of the report, it is stated, "As part of the environmental site assessment, an investigation of historical records concerning the site was conducted by Rhodes, Inc. to develop a brief history of previous occupancies and users connected with the property. This was done in an effort to identify any past uses which may have resulted in a negative environmental impact on the site soils or groundwater. Photocopies of the maps are located in the Appendix."

c. The topographical map in the final report identifies the site and puts it in brackets. Within the brackets drawn by red lines, are blue cattail hatchmarks indicating wetlands or boggy areas. This appears to be the correct location of the site.

d. The Appendix also contains a topographical map and other maps, but the subject site is mis-located on those maps. A map entitled "Priority Risk Report Map" has a star identifying the "study site" approximately one quarter mile (.25 miles) east of its actual location. The next page, another similar map, appears to be an enlargement of the previous map and also mis-locates the property approximately one quarter mile (.25

miles) east of the actual location. The third map, identified as "USGS 7.5 Minute Topographical Map" also locates the study site, approximately a quarter mile (.25 miles) east of its actual location. Noteworthy, the study site, as identified on the map, contains no blue cattail hatchmarks indicating any wetlands or boggy areas where it has mis-located the study site, but is a quarter mile down the road (east) from the correct location of the study site. The correct location of the study site on that map does show blue cattail hatchmarks, symbolic of wetlands or boggy areas.

    e. The final report does not identify any wetlands, or other environmental areas at the study site.

## **DISCUSSION OVERVIEW**

The identification of wetlands and other environmentally sensitive features was a part of the environmental assessment undertaken by Rhodes. Having been specifically asked and having agreed to identify any wetlands on the subject property, Rhodes failed to identify or discuss wetlands on the subject site. Wetlands and other environmentally sensitive features were actually present on the site, as documented in public records Rhodes was obliged to review. Rhodes was negligent in that they failed to identify and recognize the wetlands on the site which were indicated to be there on public records they had promised to review. Moreover, having failed to recognize wetlands from the information available on public maps and records, they misled Hutchison by their preliminary and final reports, which:

    a) failed to identify and point out any wetlands or other environmentally sensitive areas;

b) stated there were no environmentally sensitive areas, and

c) failed to recognize and/or discuss with Hutchison the existence of wetlands on the subject site, even though the wetlands were indicated on public records they committed to review, both in their engagement letter, and in the final report.

Rhodes' environmental assessment did not exclude wetlands by virtue of the following paragraph which appears on page 2 of its proposal:

"In order to assure that the 'due diligence' legal requirements for environmental assessments are met, the Phase I study will be performed in conformance the scope and limitations of the American Society for Testing and Materials Practices E-1527 and E-1528 *and standard industry practices.*"

The ASTM standards provide for the inclusion of such features that go beyond a Phase I Study, wherein, at ASTM E-1527 Section 12 it is noted that other environmental issues or conditions may be assessed, and there are "several non-scope considerations that persons may want to assess in connection with commercial real estate", including wetlands. In this case, Rhodes was required to identify wetlands in its study for four reasons:

(1) Hutchison specifically asked them to determine whether there were any wetlands present on the site, and they agreed to do so;

(2) Rhodes' proposal represented that they would review available information on the geographic area and the geologic and *hydrologic conditions present*, which would include wetlands;

(3) Rhodes' preliminary report to VanNostrand and Rhodes' final report do not

identify or point out any wetlands.

(4) Rhodes' graphics (topographical and other maps) used in the report generally show the presence of boggy, marshy, wetlands areas where the site is actually located, and on the three maps where the site is improperly located, show no such hatchmarks.

## CONCLUSIONS

1. The standard of care applicable to environmental professionals, performing an environmental assessment such as the one undertaken by Rhodes, obligates them to exercise reasonable and ordinary care to properly locate the site under investigation, review and interpret public records and maps applicable to that site, and accurately report the information to the client. In this instance that would include the obligation to exercise reasonable care and skill to ascertain from available information, and from an actual on-site investigation, whether or not environmentally sensitive conditions, such as wetlands, existed on the site and to set forth and discuss their findings in a report to the client.

2. Rhodes undertook to perform an environmental site assessment that included the two tracts described, and specifically stated Rhodes would "Review ... published historical, geological, topographical, and soil maps **to identify wetlands, or other environmentally sensitive features."** Published topographical maps, wetlands inventory maps, and other sources available to Rhodes, and purportedly reviewed by Rhodes and referenced and included in their final report, show the existence of wetlands and other environmentally

sensitive areas (i.e., wetlands, boggy or swampy areas) on the site. However, there are no wetlands or other environmentally sensitive features of the site identified or discussed in the report. A properly trained environmental professional, exercising reasonable care, should have recognized the symbols of wetlands and other environmentally sensitive areas and identified and discussed them in the report. In not doing so, the work of the Rhodes Report fell below the applicable standard of care and the industry standard for environmental assessment of the type undertaken in this instance, and constituted negligence on the part of Rhodes.

3. The Rhodes report, and the investigation undertaken by Rhodes, mis-identified and/or mis-located the actual site by approximately .25 mile as shown on maps included in the Appendix. This makes references to the maps misleading, because the incorrect locations do not show symbols that signify wetlands, swampy or boggy areas, whereas references to the true and correct location of the site in question do show such symbols and do indicate the presence of wetlands, swamps and boggy areas. A properly trained environmental professional, exercising reasonable care, should have correctly identified the site on the maps, recognized the symbols of wetlands and other environmentally sensitive areas, and identified and discussed them in the report. Failing to do so fell below the applicable standard of care and the industry standard for environmental assessment of the type undertaken in this instance, and constituted negligence on the part of Rhodes.

4. In their proposal Rhodes stated that they would perform their work in accordance with the scope and limitations of the American Society for Testing and Materials Practices E-1527 and E-1528, and *standard industry practices*. Rhodes failed to follow the standards and industry practices inasmuch as their report was based in part on a mis-location of the property, and did not identify and discuss environmentally sensitive areas as shown on public records and topographical maps that were purportedly studied by them, some of which were included in the Appendix of their report. This was not consistent with standard industry practice for environmental assessment of the type undertaken in this instance, and constituted negligence on the part of Rhodes.

5. The individual defendants Zimmer and Geisler signed the final report for Rhodes (Exhibit 135), as James M. Zimmer, Project Geologist, and H. Jack Geisler, P.E., Vice President, Engineering Services. Mr. Zimmer also signed Exhibit 132, the proposal. Hence, the documents show that these individuals were the environmental professionals who were responsible for the work of Rhodes on this project, and for meeting the professional and industry standards described and discussed above that were not met. Hence, as individuals, they failed to meet the applicable standards for environmental professionals in this case and were negligent in their work on this project.

12/13/05
Date

Donald A. Fay C.P.G.
The Payne Firm, Inc.
11231 Cornell Park Drive
Cincinnati, Ohio 45242

(Deposition Exhibits 132,134 and 135 have been transmitted to counsel of record by regular mail as attached to this report and have not been electronically filed.)

### CERTIFICATE OF SERVICE

I hereby certify that on, December 14, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: E. David Marshall at edavidm@iglou.com; Gayle Benner McGrath at gmcgrath@wyattfirm.com; and Thomas Robert Schuck at schuck@taftlaw.com and I **hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:**

Kevin J. Waldo, 413 Center Street, Ironton, OH 45638-1505; E. Christine Lewis, Wyatt Tarrant & Combs, LLP, 250 West Main Street, Suite 1600, Lexington, KY 40507-1746; W. Craig Robertson, Wyatt Tarrant & Combs, LLP, 250 West Main Street, Suite 1600, Lexington, KY 40507-1746; and M. Bradford Sanders, Sanders & Associates, 9122 Montgomery Road, Suite 201, Montgomery, OH 45242.

/S/ William P. Schroeder
William P. Schroeder



**Donald A. Fay, C.P.G.**
Principal

**The Payne Firm, Inc.**
11231 Cornell Park Drive
Cincinnati, Ohio 45242

| | |
|---|---|
| **EDUCATION** | M.S., Geology, Miami University, 1986. |
| | B.S., Geology, Miami University, 1981. |
| | Continuing education seminars: hydrogeology, contaminant fate and transport modeling, aquifer testing, risk assessment, remedial design, geochemistry, and business. |
| **REGISTRATION** | Registered Professional Geologist in Indiana, Tennessee, Kentucky, and Pennsylvania. |
| | Ohio Environmental Protection Agency Voluntary Action Program Certified Professional. |
| **EMPLOYMENT** | Principal, The Payne Firm, Inc., Cincinnati, Ohio, 2001 to present. |
| | Senior Project Manager, The Payne Firm, Inc., Cincinnati, Ohio, 1992 to 2001. |
| | Project Manger, The Payne Firm, Inc., 1990 to 1992. |
| | Staff Geologist, The Payne Firm, Inc., 1987 to 1990. |
| | Field Geologist, ATEC Associates, Cincinnati, Ohio, 1987. |
| | Teaching Assistant, Miami University, Oxford, Ohio, 1983 to 1986. |
| | Geophysical Logging Engineer, Dresser-Atlas, Ft. Morgan, Colorado, 1981 to 1982. |
| **EXPERIENCE** | Developed and implemented environmental management strategies for brownfields redevelopment under voluntary action programs in Ohio, Kentucky, and Indiana. This included developing preliminary completion cost estimates based on limited initial data. Site assessment and management strategies were integrated into site development plans to cost effectively characterize the property and mitigate risk. Participated in obtaining ten Covenants Not-to-Sue under Ohio's Voluntary Action Program. Acted as the Certified Professional on two VAP projects, including one under the USEPA Memorandum of Agreement track. |
| | Managed application preparation and implementation of Clean Ohio Fund projects totaling over $5 million. |
| | Experienced in expert testimony for environmental litigations involving chemical releases, contaminant fate and transport, and remediation. |

**Donald A. Fay, C.P.G.**
Page Two

---

Performed and managed environmental site assessments involving soil sampling and ground water monitoring to evaluate contamination from chemical spills and underground storage tanks. Field expertise includes soil gas surveying, borehole logging, monitor well construction, sampling protocols, and analytical laboratory data validation and interpretation.

Performed and managed site assessments and remediation associated with organic and inorganic chemical releases. Successful completion of projects in glacial, fluvial, karst, and bedrock hydrogeological settings. Experienced in aquifer testing, feasibility screening, and conceptual design and operation of soil and ground water remediation systems.

Performed and managed pre-acquisition Phase I and Phase II site assessments for various commercial and manufacturing facilities. Experienced in developing environmental cleanup cost estimates and timeframes based on the site conditions, applicable standards, and anticipated regulatory requirements.

Significant knowledge of various state and federal environmental laws and regulations, including investigation, remediation, and reporting requirements associated with underground storage tanks, RCRA, NCP, CWA, SDWA, and voluntary action programs. Experienced in operation regulatory compliance reviews, including air, hazardous and solid wastes, PCBs, SARA, storm water, and wastewater issues. Also knowledgeable of asbestos, industrial hygiene/safety and wetlands issues.

**MEMBERSHIPS**    National Brownfield Association
Ohio Brownfield Finance Partnership
National Ground Water Association
Association of Ground Water Scientists and Engineers
Geology Society of America

