UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SCOTT HUTCHISON ENTERPRISES, INC. et al., : | Civil Action No. C-1-01-776 |
| Plaintiffs, : | (Judge Weber) |
| v. : | |
| RHODES, INC., et al. : | AFFIDAVIT OF <u>W. SCOTT HUTCHISON</u> |
| Defendants. : | |

STATE OF WEST VIRGINIA    )
                                              )    SS.
COUNTY OF CABELL           )

I, W. Scott Hutchison, being duly sworn and cautioned, depose and state as follows:

1. I am the President of Scott Hutchison Enterprises, Inc. and W.N. & Scott Hutchison Partnership (sometimes jointly referred to as Hutchison), and I am competent to testify to the matters herein on the basis of my own personal knowledge of the facts and relevant documents, among other things;

2. In the summer and early fall of 1999, Hutchison became interested in purchasing a mobile home park and adjacent vacant land in Burlington, Ohio ("Property") owned by Defendant H. T. Boggs ("Boggs").

3. The Property is comprised of two distinct parcels of property separated by a public road known as Old U.S. 52. The parcel on the south side of Old U.S. 52 was developed as a mobile home park known as Boggs Landing and the parcel on the north side of Old U.S. 52 was vacant land ("Vacant Land").

4. Hutchison offered to purchase Boggs Landing and the Vacant Land in order to develop

the Vacant Land into a mobile home park.

5. On October 20, 1999, Boggs, as seller, and Hutchison, as buyer, entered into a contract to purchase Boggs Landing and the Vacant Land. The amount of the purchase price attributable to the vacant land was more than $200,000. After Boggs and Hutchison executed this contract, Hutchison contacted its bank to arrange the financing. ( See also Hutchison Depo., p.61).

6. Hutchison's bank required that it have an environmental assessment performed of the Property ("Assessment") and recommended Rhodes to conduct said Assessment. (See also Hutchison Depo., p. 51, 60-63, 76 and 80; VanNostrand Depo., pp. 60-63; Exs. 60 and 92).

7. Rhodes made a written proposal to Hutchison to conduct the Assessment and faxed it to Hutchison. The same day, Hutchison accepted Rhodes' proposal and engaged Rhodes to conduct it. (See also Rhodes Depo. pp. 38, 40-41, 52, Hutchison Depo., pp. 61-63, 81; Ex. 92).

8. The Contract with Rhodes states that Rhodes would review available information on the geographic areas and hydrologic conditions present on the Property (Ex. 132) and do the following:

(1) A walkover survey of the Property to identify an environmental concerns that may be present; and

(2) A review of deed records to establish a chain-of-title for the Property; and

(3) A review of federal and state government records to identify facilities listed in U.S. Environmental Protection Agency and Commonwealth of Kentucky environmental databases; and

  (4) A review of published historical, geological, topographic and soil maps to identify any…wetlands or other environmentally sensitive features; and Survey of surrounding properties to identify current facilities with the potential to produce a negative environmental impact on the site.( See also Ex. 132).

9. When Rhodes conducted the site reconnaissance, I met Rhodes' representative Adonis Spivey at the Property, and told her that I wanted to make sure she did two things: (i) make sure the Property is out of the hundred-year flood plain and (ii) make sure that there were not any wetlands on the Property. (See also Hutchison Depo., pp. 59-61).

10. Previously, I had also specifically told Adonis Spivey, my contact person with Rhodes, to ascertain if there were wetlands on the Property, because I needed to know that before closing on the property, and she agreed to do so. (See also Hutchison Depo., p. 82)..

11. I am now informed that Rhodes' Assessment did not include the determination of the existence of wetlands on the Property, despite the fact that its contract with Hutchison states it would determine the existence of wetlands on the Property, and its representative, Adonis Spivey, agreed to do so in direct conversations with me. (See also, Rhodes Depo., pp. 34-35, 58, 76, 147; Exs. 35 and 69).

12. Instead, Rhodes' representatives noted the Vacant Land consisted of 13.37 acres of scrubland and there was secondary tree and bramble growth over the entire site. (Ex. 135; Rhodes Depo., pp. 162-163, 168).

13. Rhodes reported all of its findings in a document entitled "Report of Phase I Environmental Site Assessment of Two Tracts: A 14.64 Acre Mobile Home Park and an Undeveloped 13.37 Acre Tract") ("Report"). (See also, Rhodes Depo., p. 47; Exs. 71, 134, 135).

14. On December 6, 1999, Boggs and Hutchison closed on the Contract. (Hutchsion Depo., pp. 121-122).

15. After the closing, Hutchison leased equipment in order to develop the Vacant Land. (See also Hutchison Depo., pp. 144, 157-158), and in January of 2000, Hutchison began clearing the Vacant Land. (See also Hutchison Depo., pp. 124-125, 135, 147-148).

16. Shortly thereafter, Hutchison's contractor Andrew Lockwood became concerned about the possible existence of wetlands on the Vacant Land, so it contacted the Army Corps of Engineers ("Corps"). (See also, Fudge Depo., pp. 56, 76-77, Ex. 166).

17. The Corps advised Hutchison that the Vacant Land is located in jurisdictional wetlands and issued a cease and desist order prohibiting further work on the Vacant Land. (See also, Fudge Depo., pp. 13-14, 56, 76-77; See also, Hutchison Depo., p. 135; Dep. Exs. 95, 99 and 164). As a result, Hutchison cannot develop the Vacant Land as intended, nor use the land and it is losing money each month. (See also Hutchison Depo., pp. 174, 178-180).

18. Since the Vacant Land is located in jurisdictional wetlands and the Army Corps of Engineers issued a cease and desist order prohibiting further work on the Vacant Land, Hutchison cannot develop the Vacant Land as intended, nor use the land, as a consequence of which, Hutchison is losing money each month.

19. Additionally, Hutchison must continue to pay the mortgage and debt service for the Vacant Land, and incur the costs associated with efforts at remediation the Property, which include, but are not limited to, the costs of purchasing remediation land, and the costs associated with getting Corps and EPA approval for the remediation which will exceed $200,000.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
W. Scott Hutchison

Sworn to before me and subscribed in my presence, this 31st day of January, 2006.

[SEAL]  OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
KATHY L. SAUNDERS
2309 Miller Rd.
Huntington, WV 25701
My commission expires Dec. 9, 2007

_____
Notary Public

## CERTIFICATE OF SERVICE

      I hereby certify that on February 10, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: E. David Marshall at edavidm@iglou.com; Gayle Benner McGrath at gmcgrath@wyattfirm.com; and Thomas Robert Schuck at schuck@taftlaw.com and **I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:**

Kevin J. Waldo, 413 Center Street, Ironton, OH 45638-1505; E. Christine Lewis, Wyatt Tarrant & Combs, LLP, 250 West Main Street, Suite 1600, Lexington, KY 40507-1746; W. Craig Robertson, Wyatt Tarrant & Combs, LLP, 250 West Main Street, Suite 1600, Lexington, KY 40507-1746; and M. Bradford Sanders, Sanders & Associates, 9122 Montgomery Road, Suite 201, Montgomery, OH 45242.

                                              /S/ William P. Schroeder
                                              William P. Schroeder (0027123)